[No. H030890. Sixth Dist. Mar. 27, 2008.]

SANDRA FERRARO, Plaintiff and Appellant, v.
SUSAN CAMARLINGHI et al., Defendants and Respondents.

512

514

### COUNSEL

Steven J. Andre for Plaintiff and Appellant.

Michael G. Desmarais for Defendants and Respondents.

### OPINION

**RUSHING, P. J.**—The fundamental precept of due process is that before official action may be taken in derogation of an individual's rights, liberties, or property, the individual must be permitted a fair opportunity to appear before the decisional authority and show, if he or she can, why the proposed action should not be taken. In the proceedings giving rise to this and two companion appeals, this principle was drowned in a maelstrom of procedural confusion and obfuscation. The unfortunate result has been a tremendous waste of time and resources.

The underlying controversy concerns the decision by decedent Jane E. Ferraro to leave all her property to her two children, respondents Susan Camarlinghi and Michael Kelley. One of her two stepdaughters, Patricia Dean Ferraro Hull, filed an action alleging that this disposition violated an agreement between decedent and her predeceased husband, Pat Ferraro, to divide the property among her two children and his two daughters, Patricia and appellant Sandra Ferraro. In the course of several civil suits and probate

proceedings following decedent's death, all of the claimants except appellant settled their differences without notice to her, and then secured a stipulated order from the court purporting to extinguish her rights against decedent's estate and trust. The settling parties thereafter cited that order, and a purported default entered against appellant in one of the civil actions, to successfully obstruct all efforts by appellant to pursue her claims on the merits.

The present appeal is taken from an order striking appellant's civil complaint following a rejection of her claim in the probate proceedings. The question presented is whether the trial court properly struck the complaint on the grounds that it was precluded by prior judgments or orders, the statute of limitations, or the compulsory cross-complaint rule. We conclude that the trial court erred because none of the orders cited as bars to the action was shown to possess the characteristics necessary to give them preclusive effect against her. We also hold that her claims were asserted within the applicable limitations period, and that the compulsory cross-complaint rule does not apply to those claims. Accordingly, we will reverse the judgment. In one of the companion appeals (*Camarlinghi v. Ferraro* (Mar. 27, 2008, H030777) [nonpub. opn.]), we hold that the court also erred by approving a decree of final distribution while appellant's claims remained unresolved. In the other (*Ferraro v. Ferraro* (Mar. 27, 2008, H030206) [nonpub. opn.]), we hold that certain orders concerning appellant's attempts to assert a cross-action in her sister's civil case are not appealable.

BACKGROUND

A. *Patricia's Civil Action and Appellant's "Default"*

On a date not disclosed by the record, decedent Jane Ferraro married Pat Ferraro. Pat had two children, Patricia and Sandra, by a prior marriage.[1] Decedent likewise had two children, respondents Susan and Michael.

Pat died on July 15, 1987. In 1993, decedent established a trust of which respondents are the successor trustees. At the same time she executed a will leaving all of her tangible personal property to respondents, and the residue of her estate to the trustees of the trust. The will appointed respondents to be co-executors of the estate. It identified Patricia and appellant as "stepchildren now living" but declared an intent not to provide for any heir other than as specifically stated, and defined "child" not to include "stepchild."

---

[1] Because most of the actors have used various surnames, and in the hope of greater narrative clarity, we will often use first names.

Decedent died on April 9, 2004. No attempt was made initially to probate her will, but on June 22, 2004, Susan filed a petition in Santa Cruz County, No. PR043226, to determine the existence of a trust.[2]

On July 8, 2004, Patricia filed a civil action in Santa Clara County alleging that decedent and Pat had agreed orally and in writing that "upon the death of the last survivor, all of their estate properties and assets would be left equally to the four children . . . ." The complaint alleged in essence that decedent had violated this agreement by selling or appropriating to her own and her children's exclusive use certain properties in Santa Cruz and Santa Clara counties. The complaint named respondents as defendants, both individually and as successor trustees under the 1993 trust.[3] The complaint also named appellant as a defendant on the stated ground that she was "the sister of plaintiff and . . . named as a necessary party, because she has not consented to be joined as a plaintiff." The complaint asserted that decedent's agreement with Pat was "for the benefit of plaintiff and plaintiff's sister," that defendants "knew or should have known of plaintiff's claim and the claim of plaintiff's sister," and that by the conduct alleged in the complaint they "intended to exclude plaintiff and plaintiff's sister" from the benefits of the agreement. The complaint sought a variety of remedies, including "[a] declaration of rights and duties in connection with and relating to status of the parties, their relationship and obligations thereunder." More specifically it sought a declaration that all of decedent's property was held in constructive trust, that Patricia was "the beneficiary of the constructive trust," and that "defendants, excluding SANDRA LYNN WISE (FERRARO), hold all of said assets as constructive trustee for the use and benefit of plaintiff."[4] It also included a request for "[r]elief as against SANDRA LYNN WISE (FERRARO) as to any relief obtained to the extent and benefits herein."

On July 15, 2004, a copy of Patricia's complaint was personally served on appellant at "3339 Linduir [sic] Dr[ive]" in San Jose. Appellant did not file a response, but attempted to participate in the action by directly contacting

---

[2] When Patricia later petitioned for letters of special administration, she alleged that the estate had no assets—decedent's property presumably having been transferred into the trust, or otherwise transferred inter vivos—and that Susan and Michael therefore had no intention of petitioning to administer the estate.

[3] Also named was Susan's husband, Dennis Camarlinghi, though only in the caption. He was a party to some of the later proceedings, including the settlement and stipulation for judgment. His role in relevant events is obscure at best, and has no apparent bearing on any issue before us.

[4] This language has been alluded to at various times as manifesting an intent to exclude appellant from any relief awarded under the complaint. It does not. Rather it expressly relieves her from the constructive trust sought to be imposed on respondents.

Patricia and Patricia's attorney, Robert Mezzetti.[5] These efforts were firmly rebuffed, and Sandra apparently took no action to join the suit until she engaged counsel in early 2005. (See pt. II.D., *post.*)

On November 1, 2004, a copy of a request to enter default was mailed to appellant at "3339 Linduir [*sic*] Drive" in San Jose. On the following day, Patricia applied for, and the superior court clerk entered, appellant's purported default. Appellant later declared that no one ever warned her of an impending default, and she never received notice of the request to enter default. She only learned that her default had been entered when her attorney, whom she engaged in early 2005, so advised her.

## B. *Probate Proceedings*

On December 1, 2004, Patricia filed a probate petition in Santa Clara County for letters of special administration with respect to decedent's estate. The petition "request[ed] the power to pursue" Patricia's civil action. Appellant was identified in an attached "list of parties" as decedent's stepdaughter; her address was given, "so far as known to or reasonably ascertainable by petitioner," as "3339 Linduir [*sic*] Drive" in San Jose. An accompanying proof of service, however, showed that a copy of the petition was mailed to appellant at 16091 Highland in San Jose. A year later appellant would declare without contradiction that she had been "unaware that there was any proceeding pending concerning the estate of Jane Ferraro until days ago when my attorney advised me of this fact."

On December 14, 2004, Susan filed a competing petition in the Santa Clara probate matter, seeking the probate of decedent's will of July 12, 1993, and her own (Susan's) appointment as personal representative to administer decedent's estate.[6] A proof of service accompanying the notice of the petition indicated that a copy was mailed to appellant at 16091 Highland in San Jose.

On December 29, 2004, in the Santa Clara probate matter, Patricia filed a "contest . . . and opposition to probate of will and trust" (will contest). The petition named Susan and Michael as respondents and asserted five grounds of objection to probate of the July 1993 will. Four were stated in purely conclusory language: lack of sound mind, lack of due execution, undue influence, and duress. (See Prob. Code, § 8252.) The fifth, fraud, was alleged with greater specificity, as follows: "The purported documents were procured

---

[5] It appears that Patricia has been represented in this matter both by Robert L. Mezzetti and Robert L. Mezzetti II. We gather that it was the elder Mezzetti with whom appellant attempted to communicate.

[6] Although the petition itself does not appear in this record, a later reference suggests that it may also have sought confirmation of a trust.

to be made, and to be signed by decedent, by reason of the fraud of [Susan and Michael] in that they and decedent eliminated contestant Patricia Ferraro as an heir to the Jane E. Ferraro Estate and in violation of the agreements oral and written, decedent Jane E. Ferraro had with contestant's predeceased father, Pat Ferraro, as specified and set forth in Santa Clara County Superior Court action number 1-04-CV-022923," i.e., Patricia's civil complaint, a copy of which was attached. Appellant was mentioned twice in the will contest: first in quoting the caption of Patricia's civil complaint, where appellant is described as "named herein as a necessary party, because she has not been joined as a plaintiff"; and second in listing her as an "heir[] of decedent," giving her address as 3339 Lindmuir Drive, San Jose. We find no evidence in this record of any attempt to impart notice of the will contest to appellant.

On December 30, 2004, according to the later application for approval of the settlement agreement and stipulation of the settling parties, the court issued letters of special administration to Susan. The present record does not indicate what these letters authorized her to do.

## C. *Appellant's Santa Cruz Action*

According to appellant's attorney, Steven Andre, he was engaged in early 2005 to represent appellant in connection with her rights arising from the alleged agreement between her father and decedent. He declared without contradiction that upon his retention, he contacted Patricia's attorney, Mezzetti, "to inquire as to the status of the case." Mezzetti informed him of the default. Mezzetti asked to see copies of the responsive pleadings Andre proposed to file. After Andre sent them, Mezzetti refused to stipulate to relief from the default, or to otherwise set it aside.

On August 17, 2005, Andre filed an action in Santa Cruz County on appellant's behalf, asserting a claim to one-quarter of decedent's estate. Three defendants were identified: Susan individually, as attorney in fact for decedent, and as successor trustee to the trust of July 12, 1993; Michael individually and as successor trustee; and Patricia "as a necessary party, because she has not joined as a plaintiff." The complaint alleged that decedent had disposed of certain properties in violation of an agreement with Pat whereby their property and assets would be preserved and not disposed of during their lifetimes, and upon their deaths would be left in equal shares to their respective children. It asserted causes of action for breach of contract, "breach of express trust terms," "fraud, express and implied," unjust enrichment, constructive trust, "conversion and tracing," "interference with advantageous relations," declaratory relief, injunction, and accounting.

Respondents demurred to appellant's Santa Cruz complaint on the ground that Patricia's civil action constituted another action pending on the same cause of action. The demurrer was heard by Judge Yonts, who sustained it by order dated December 8, 2005, ordering all proceedings stayed until a "final determination" of Patricia's action. Judge Yonts declared at the hearing and in his formal order that appellant was "an adverse party" in Patricia's Santa Clara action.

## D. *Settlement Agreement; Consolidation; Motion for Approval*

On November 23, 2005, counsel for Susan and Michael filed a motion in Patricia's action and a petition in the Santa Clara probate matter seeking court approval of, and entry of "judgment" in accordance with, a settlement agreement reached by the parties other than appellant.[7] The civil notice stated that the motion was made on the grounds "that plaintiff Patricia Ferraro and defendants Susan Camarlinghi, Dennis Camarlinghi, and Michael Kelley entered into a written stipulation settling this case, that defendant Sandra Lynn Wise Ferraro's default was entered in this case on November 2, 2004, and that the settlement is just, fair, and reasonable." The probate petition also alluded to appellant's supposed default, and asserted that "settlement negotiations have culminated in a settlement that resolves the claims to the Trust and estate of the decedent, and is just, fair and reasonable, and in the best interests of those persons interested in the Trust and estate of the decedent." The accompanying stipulation recited that appellant's default had been taken on Patricia's complaint. The supporting papers repeatedly asserted that the Santa Cruz court had "found" that appellant was adverse to Patricia in the civil action.

The settlement agreement was embodied in a stipulation accompanying the motion and petition. It called for distribution of $587,500 and certain personal items to Patricia, $50,000 to one Judith Montoya, and the remainder of the disputed property to Susan and Michael.[8] The signatories agreed to release one another from all other liability and called upon Patricia and Judith to "cooperate with Susan, Dennis and Michael in the defense of any and all claims by Sandra Lynn Wise Ferraro relating or pertaining to Jane's Trust or estate by objecting to and opposing those claims." The stipulation stated that

---

[7] Thirteen days earlier, at the hearing on the demurrer, counsel for Patricia had assured Judge Yonts that there were "all kinds of pleadings" in the Santa Clara court, which would "take care of all of the issues," including appellant's supposed default on the complaint as well as an asserted failure to appear at her deposition. He did not mention any impending settlement, or the settling parties' intention to seek, as part of their settlement, the extinguishment of appellant's claims without litigation.

[8] Judith Montoya had filed an action to recover $50,000 that decedent had allegedly owed her late mother on a real estate transaction. Judith was represented in these matters by the Mezzetti firm.

Patricia's civil complaint and certain other actions "are dismissed with prejudice." It also declared, "No part of the Trust or the estate shall be distributed and paid to Sandra Lynn Wise Ferraro." It recited that the parties believed the disposition thus arranged to be "just, fair, and reasonable and in the best interests of all persons interested in Jane's Trust and estate . . . ."

The agreement was conditioned upon its approval and adoption as an order of the court in both Patricia's and Judith's civil actions and in the probate proceeding. It was accompanied by a proposed stipulated order, which "approved and confirmed" the settlement agreement "in all respects" and adopted the parties' stipulation. The order admitted decedent's will of July 12, 1993, to probate, and appointed Susan executor without bond. It directed her to sell certain real property and to distribute $637,500 to Patricia, Judith, and their attorneys, of which sum $50,000 was "allocable to Judith." Susan was directed to distribute another property to herself and Michael. The residue of the estate was to be distributed to respondents. The order expressly declared, "No part of the Trust or the estate shall be distributed or paid to [appellant] Sandra Lynn Wise Ferraro." It also provided, "Patricia Dean Ferraro Hull and Judith Montoya shall dismiss with prejudice all of their actions, and all of their actions are hereby dismissed with prejudice, including, but not limited to" four specified matters.

In combination with the motion for approval of the settlement, respondents' attorney, Michael Desmarais, applied to the probate court for an ex parte order consolidating Patricia's and Judith's civil actions with the pending probate proceeding. The application stated that consolidation was sought "so that the probate court can hear and decide the two civil motions for approval of the settlement and for judgment as well as the probate petition for approval of the settlement." The application acknowledged the court's power to "order a joint hearing or trial of any or all of the matters in issue in the actions . . . ." (See Code Civ. Proc., § 1048.) It did not merely pray for a joint hearing, however, but for consolidation of the actions without stated limitation or condition, and the actions have since been treated as consolidated for all purposes, at least when such treatment has appeared expedient to respondents. The application set forth no basis for a finding of good cause to dispense with proceeding by noticed motion. (See Cal. Rules of Court, rule 3.1202(c); Cal. Rules of Court, former rule 379(g); 6 Witkin, Cal. Procedure (4th ed. 1997) Proceedings Without Trial, § 54, p. 453.) Nor did it indicate that any attempt had been made to notify appellant or her counsel of the application. (See 6 Witkin, *supra*, Proceedings Without Trial, § 129, p. 543; Cal. Rules of Court, rules 3.1203(a), 3.1204(b); Cal. Rules of Court, former rules 379(a), 379(b).)

E. *Appellant's Motion for Joinder or Intervention*

On December 14, 2005, appellant filed a motion to be joined as a plaintiff, or for leave to intervene, in Patricia's will contest, together with objections to the proposed "probate of will and trust." In an attached proposed complaint in intervention, she alleged that Pat and decedent had agreed that the survivor of them would leave their estate in equal shares to their four children, but that after Pat's death this agreement was violated by various transfers of property to the exclusion of Patricia and appellant. Causes of action were again stated for breach of contract, breach of express trust, fraud, undue influence, unjust enrichment, constructive trust, conversion, interference with advantageous relations, declaratory and injunctive relief, and an accounting. It was also alleged that Patricia had "resolve[d]" her claim to a share of the estate by entering into a "binding settlement agreement." Appellant prayed for a denial or revocation of probate with respect to decedent's will, imposition of a constructive trust, damages, and other relief.

In opposition to the motion for joinder, Attorney Desmarais asserted that appellant was already a party, having "been a party to the civil action since July 8, 2004, and . . . a party to the probate action since December 1, 2004 . . . ." Nor was she a necessary or indispensable party to the will contest, he asserted, because as an "interested party" under the Probate Code, she had standing to file her own will contest. "Moreover," he cryptically asserted, "default 'is equivalent to trial within the meaning of section 387 of the Code of Civil Procedure' (*Stern & Goodman Inv. Co. v. Danziger* (1929) 206 Cal.[] 456, 460 [274 P. 748])."[9] He also asserted that "Due to the

---

[9] These assertions are misleading at best. As discussed at greater length below, no attempt was made to provide a factual or legal foundation for the claim that appellant was a party to the probate proceedings. Nor did her intervention require that she be an indispensable party—only that she have "an interest in the matter in litigation." (Code Civ. Proc., § 387, subd. (a).) As for the third point, the rule alluded to—that entry of a default is a "trial" such as will preclude subsequent intervention—was extirpated from our law 30 years ago. The cited case, *Stern & Goodman Inv. Co. v. Danziger, supra,* 206 Cal. at pp. 460–461, contains a makeweight dictum in which the court appears to reason that the complaints there were filed too late because (1) the governing statute at that time (Code Civ. Proc., former § 387; Stats. 1907, ch. 371, § 1, p. 703) required intervention to be sought "before trial," (2) the defaults of the interveners' predecessors in interest had already been taken when intervention was sought, and (3) those defaults were equivalent to trial for purposes of the statutory limitation. That reasoning, and any rule implicit in it, were substantially eroded by case law four decades ago. (See *Linder v. Vogue Investments, Inc.* (1966) 239 Cal.App.2d 338, 343–344 [48 Cal.Rptr. 633] [defendant's default not an absolute bar to intervention]; *Johnson v. Hayes Cal Builders, Inc.* (1963) 60 Cal.2d 572, 575–576 [35 Cal.Rptr. 618, 387 P.2d 394] [where a default or default judgment is void on its face, it does not constrain a party's right to intervene].) Any remaining vestiges were obliterated in 1977, when the statute was amended to replace the requirement of a motion "before trial" with one of "timely application." (Code Civ. Proc., § 387; see Stats. 1977, ch. 450, § 1, p. 1486; cf. Stats. 1970, ch. 484, § 1, pp. 960, 961.)

protracted length of this litigation, the estate's real property stands to be lost or its value seriously impaired if there is any further delay in the settlement of these proceedings. To permit Sandra to now prevent or even delay the settlement of these proceedings would be unduly prejudicial to Susan and Michael."[10]

On December 28, 2005, appellant filed an answer to the consolidated actions. She admitted all the allegations of Patricia's complaint and prayed for a declaration imposing a constructive trust in her favor. So far as we can discern, no demurrer, motion to strike, or other challenge to this pleading was ever filed.

### F. Orders Denying Intervention and Approving Settlement

On December 29, 2005, the motion and petitions to approve the settlement were heard along with appellant's motion for joinder or leave to intervene. During the hearing, the court, or more precisely a person not identified on the record, whom we surmise to be the probate examiner, repeatedly asked whether it was possible to approve the settlement while reserving appellant's claims for later determination. Attorney Desmarais replied, "Absolutely not," insisting that the settlement was conditioned on the extinguishment of appellant's claims and the withholding of any part of the estate from her, and that the only way to preserve her claims was to deny the petition to approve the settlements. Momentarily ignoring Patricia's civil complaint for equitable relief and damages, counsel argued that probate proceedings are in rem and that a settlement could therefore be approved without the consent of all potentially affected claimants.[11] Counsel acknowledged that the court had to "make a fundamental judgment call" as to whether it was "a fair settlement for anybody who had an interest in the estate." Counsel urged the court, somewhat obliquely, to find that it was fair as to appellant in light of the "default judgment" against her as well as "the lack of time and her factual inability to justify any claims." Counsel also professed to know of no colorable basis on which appellant could assert a claim.

By formal order entered on February 2, 2006, the court denied appellant's motion for joinder or intervention. On the same day, it executed an order

---

[10] Although little was made of this assertion below and none is made on appeal, the delay in these matters appears to us largely if not entirely attributable to the conduct of counsel for Patricia, in the first instance, and counsel for respondents, in the second. Likewise, any undue expense occasioned to the parties by these proceedings seems attributable in major part to the tactical decision by those attorneys to induce the court to summarily extinguish the rights of a known claimant without ever establishing a colorable foundation for such an extraordinary action.

[11] So far as we can tell, counsel has never made this assertion in writing and has never cited any authority for it.

approving the proposed settlement. The order varied in numerous respects from the stipulated order attached to the settlement and included in the notice of motion. Perhaps most significantly, it declared that the distributions called for under the settlement would not be made until four months after Susan's filing of a petition for distribution. It included the stipulated provision, "No part of the Trust or the estate shall be distributed or paid to Sandra Lynn Wise Ferraro." It also stated, "Patricia Dean Ferraro Hull and Judith Montoya shall dismiss with prejudice all of their actions, and all of their actions are hereby dismissed with prejudice, including, but not limited to," Patricia's civil action and three other matters.

## G. Attempted Cross-action

On March 3, 2006, appellant filed a cross-complaint in the consolidated proceeding asserting claims for breach of contract, breach of express trust, fraud, undue influence, unjust enrichment, constructive trust, "conversion and tracing," interference with advantageous relations, declaratory relief, injunctive relief, and an accounting. Counsel for respondents obtained a hearing date on shortened notice to move to strike the cross-complaint and expunge an associated lis pendens. In the motion, he asserted that the "so-called cross-complaint" was "illegally filed without leave of court" and was barred by (1) the "default judgment [sic] against plaintiff in these proceedings"; (2) the "statute of limitations," i.e., Code of Civil Procedure sections 473, subdivision (b), 366.2, and 366.3; (3) the court's earlier order denying joinder or intervention; and (4) the order approving the settlement and declaring that appellant should recover nothing against the estate. Counsel for appellant rejoined that she was entitled to file the cross-complaint under Code of Civil Procedure section 428.50, subdivision (b), as a matter of right because it did not name plaintiff (Patricia) as a cross-defendant and no trial date had been set. She argued that under the authority of *Voyce v. Superior Court* (1942) 20 Cal.2d 479 [127 P.2d 536], she was entitled to proceed on her claims, regardless of any actions by Patricia or other parties. The default was not a bar, she argued, because (1) she had filed an answer in the consolidated action without objection; (2) Susan and Michael had no standing to assert a default obtained by Patricia; and (3) the consolidation of the actions had operated, as would an amendment to the complaint, to "open" the default. She argued that the parties could not by their settlement extinguish her claims. As to the limitations issue, she argued that her claims were not barred by failure to file within the limitations period so long as Patricia's complaint was timely.

On March 23, 2006, the court entered a formal order granting the motion to strike the cross-complaint "without leave to amend."

On April 10, 2006, appellant moved for *leave* to file a cross-complaint, apparently on the theory that the court might have stricken her first cross-complaint solely on the ground that she had filed it without leave of court. Susan and Michael again opposed the attempt primarily on the ground that it had already been rejected in, or was otherwise precluded by, previous orders. The court denied the motion. On May 18, 2006, appellant took an appeal to this court (*Ferraro v. Ferraro, supra*, H030206) from the orders striking her first cross-complaint and denying leave to file a second.

## H. *Appellant's Probate Claim; Separate Suit; Order Striking Complaint*

On February 7, 2006, appellant filed a creditor's claim in the probate matter seeking "1/4 of [decedent's] estate." An attached statement described the agreement between Pat and decedent whereby the survivor of them would leave his or her estate in equal shares to their four children. Causes of action were set forth on theories of breach of contract, breach of express trust, fraud, undue influence, unjust enrichment, constructive trust, conversion, interference with advantageous relations, declaratory and injunctive relief, and an accounting. On March 24, 2006, Susan rejected this claim. On May 24, 2006, appellant brought a new civil action, No. 106CV064293, on the rejected claim. Again she named respondents, but not Patricia, as defendants. They moved to strike the complaint on the familiar grounds that it was "illegally filed without leave of court," and was barred by the "default judgment," the statute of limitations, and the stipulated order. In a supplemental declaration, counsel for respondents alluded not only to the various orders already discussed here but also to an order in which yet another judge had assertedly rejected appellant's arguments, this time in denying a motion by her to compel discovery.[12] On September 29, 2006, the court granted the motion to strike "without leave to amend." The present appeal is from this order.[13]

---

[12] Certain curiosities surrounding respondents' citation of this order are described in part II.E.3., *post.*

[13] The order striking the complaint is not itself appealable. (9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 114, p. 179.) The correct procedure would have been to follow the order with a judgment of dismissal. (See Code Civ. Proc., §§ 581, subd. (f)(4), 581d.) It appears from the court's Web site that no such judgment has been entered. To avoid the delay and wasted resources of an appellate dismissal on this ground—which would only result in entry of judgment followed by a new appeal—we direct an amendment of the order granting the motion to strike to include the statement, "The complaint is dismissed." (See *Munoz v. Davis* (1983) 141 Cal.App.3d 420, 431 [190 Cal.Rptr. 400].)

## DISCUSSION

### I. *Standard of Review*

This appeal focuses on the trial court's order striking appellant's complaint on her denied probate claim. That order, like any order under appellate scrutiny, is entitled to a presumption of correctness. (9 Witkin, Cal. Procedure, *supra*, Appeal, § 349, p. 394.) This means that appellant bears the burden of affirmatively demonstrating error in the order. (*Id.*, § 409, p. 461.)

█ The standard of review, however, is complicated by respondents' chosen means of challenging appellant's complaint. They filed a motion to strike, which ordinarily invokes the trial court's discretion and a correspondingly deferential standard of review. (See *Leader v. Health Industries of America, Inc.* (2001) 89 Cal.App.4th 603, 612, 614 [107 Cal.Rptr.2d 489].) A motion to strike, however, was not the proper vehicle for the kind of challenge they mounted. The governing statute authorizes such a motion in two situations. The first is where a party challenges "irrelevant, false, or improper matter inserted in any pleading." (Code Civ. Proc., § 436, subd. (a).) This does not describe respondents' attack on appellant's complaint. They did not attack "matter inserted" in that pleading, but the pleading as a whole. The cited subdivision does not authorize attacks on entire causes of action, let alone entire pleadings. (*Quiroz v. Seventh Ave. Center* (2006) 140 Cal.App.4th 1256, 1281 [45 Cal.Rptr.3d 222].) Its purpose is to authorize the excision of superfluous or abusive allegations. "[M]atter that is essential to a cause of action should not be struck and it is error to do so." (*Ibid.*)

Nor did respondents' motion properly fall within subdivision (b) of Code of Civil Procedure section 436 (section 436(b)), which authorizes a challenge to "all or any part of any pleading not drawn or filed in conformity with the laws of this state, a court rule, or an order of the court." While this language might be broadly construed to reach *any* deficiency in a pleading, including substantive ones, that is not its purpose or effect. Rather it authorizes the striking of a pleading due to improprieties in its *form* or in the *procedures* pursuant to which it was filed. This provision is commonly invoked to challenge pleadings filed in violation of a deadline, court order, or requirement of prior leave of court. (E.g., *Leader v. Health Industries of America, Inc., supra*, 89 Cal.App.4th 603, 613 ["plaintiffs' failure to file an amended complaint within the time allowed by the court subjected any subsequently filed pleading to a motion to strike, either by defendants or on the court's own motion"].)

Respondents' notice of motion contained the passing assertion that appellant's complaint was "illegally filed without leave of court," but no attempt was ever made to substantiate this assertion by identifying any rule or order that was violated by the filing of the complaint. Indeed the assertion of illegal filing appeared *only* in the notice of motion; no argument supporting it was offered. It is almost certainly a product of cutting and pasting from respondents' earlier challenges to appellant's cross-complaints. The only grounds supported by anything resembling argument were that the complaint was barred by (1) a supposed "default judgment" against appellant on Patricia's complaint, (2) the statute of limitations, and (3) the stipulated order that "No part of the Trust or the estate shall be paid to [appellant] Sandra Lynn Wise Ferraro."

The gist of these objections is that the complaint failed to state facts sufficient to constitute a cause of action. This is ground not for a motion to strike, but for a general demurrer. (See Code Civ. Proc., § 430.10, subd. (e).) We will therefore view the order as one sustaining such a demurrer without leave to amend. As such it presents only questions of law, i.e., whether appellant's complaint is barred on its face, or on the face of judicially noticeable matter, by prior orders or the statute of limitations. The trial court's rulings on such questions of law are subject to independent appellate review. (*Morgan Creek Residential v. Kemp* (2007) 153 Cal.App.4th 675, 683 [63 Cal.Rptr.3d 232]; see *JKH Enterprises, Inc. v. Department of Industrial Relations* (2006) 142 Cal.App.4th 1046, 1058, fn. 11 [48 Cal.Rptr.3d 563] ["pure issues of law are always subject to independent appellate court review"].)

## II. *Preclusion by Prior Orders*

### A. *Introduction; Governing Principles*

Respondents contend that appellant is barred from proceeding with her claims by virtue of Judge Levinger's orders of February 2, 2006, which (1) denied appellant's motion to intervene or be joined in Patricia's civil action; and (2) approved the settling parties' settlement, including their stipulated decree that "[n]o part of the Trust or the estate shall be distributed or paid to [appellant] Sandra Lynn Wise Ferraro." Respondents have also alluded, here and below, to the binding effect of a mysterious "default judgment" against appellant. Elsewhere they suggest that the clerk's entry of appellant's default, in and of itself, possessed some preclusive effect.

■ The burden of establishing preclusion by prior adjudication (res judicata) rests squarely on the party asserting it. (*Vella v. Hudgins* (1977) 20 Cal.3d 251, 257 [142 Cal.Rptr. 414, 572 P.2d 28]; *Nicholson v. Fazeli* (2003)

113 Cal.App.4th 1091, 1100 [6 Cal.Rptr.3d 881]; *Landeros v. Pankey* (1995) 39 Cal.App.4th 1167, 1171 [46 Cal.Rptr.2d 165].) Nothing in the present record permits a conclusion that respondents carried this burden. Their counsel has never done much more than utter the incantation "res judicata" and then rain vitriol upon his opponent's attempts to rebut this phantom argument.[14] No specifically apposite authority was cited below, or is cited here, in support of the claimed preclusion. Counsel makes a passing allusion to Code of Civil Procedure section 1908, part of which describes the conclusive effect to a "judgment or final order." (Code Civ. Proc., § 1908, subd. (a).) But he does not discuss the actual terms of that statute, which has been characterized as "a codification of the res judicata doctrine." (*Federation of Hillside & Canyon Assns. v. City of Los Angeles* (2004) 126 Cal.App.4th 1180, 1205 [24 Cal.Rptr.3d 543].) Nor does he acknowledge the companion statute describing the effect of "[o]ther judicial orders." (Code Civ. Proc., § 1909.) He has simply made no attempt, below or here, to establish that the elements of res judicata, as developed by case law or set forth in the statutes, are actually present.

Were it not for the presumption of correctness we would be strongly inclined to reverse the order under review solely on the basis that respondents have never made, or attempted to make, a prima facie showing that *any* of the cited orders possesses the characteristics necessary to give it preclusive effect. Because of that presumption, however, we must attempt on our own motion, with such help as appellant may give, to sweep away the fog of respondents' presentation and attempt to ascertain whether any of the orders to which they allude actually possess the characteristics of a conclusive judgment or order.

■ The preclusive effects of a prior judgment or similar adjudication—traditionally known as res judicata—are of two distinct kinds: claim preclusion and issue preclusion. Claim preclusion "prevents relitigation of the *same cause of action* in a second suit between the same parties or parties in privity with them." (*Mycogen Corp. v. Monsanto Co.* (2002) 28 Cal.4th 888, 896 [123

---

[14] For instance, respondents argue that appellant "cannot avoid the bar of her default by the *ruse* of filing her constructive trust action under a new Santa Clara County Superior Court case number . . . ." (Italics added.) But if there is a "ruse," it is not perpetrated by appellant. She was entitled to file and prosecute a claim *unless and until respondents affirmatively showed it to be barred*—a showing they have never attempted to make. Similarly, respondents' counsel attacks his opponent for pointing out, quite correctly, that there was no default judgment below and that a clerk's default, as distinct from a judgment, has no preclusive effect. This "*deliberately* misses the point," counsel insists, because it is "Judge Levinger's two . . . orders . . . that is [*sic*] res judicata as to any of appellant's claims . . . ." (Italics added.) Again, if there is any evasion or attempt at deception, it is not perpetrated by appellant's counsel. In the sentence next following the one just quoted—in which counsel for respondents seems to disclaim any reliance on a "default judgment"—he reiterates his repeated assertion in the trial court that "[a] *default judgment* bars the claims of the defaulting party just as though there had been a judgment on the merits against the defaulting part[y] . . . ." (Italics added.)

Cal.Rptr.2d 432, 51 P.3d 297] (*Mycogen Corp.*), italics added; see Rest.2d Judgments, §§ 17(1) & (2), 18(1), 19.) The doctrine bars the plaintiff from bringing a second suit on a cause of action that has already been litigated to judgment. It rests on the principle that a plaintiff is entitled to only one fair opportunity to litigate a given cause of action. He or she cannot "split" it by reserving a portion for later adjudication; nor can he or she expect to be given a second opportunity to cure legal or factual deficiencies that led to his or her defeat in a prior suit. (See *Mycogen Corp., supra*, 28 Cal.4th at p. 897.)

The doctrine is not, however, a mechanism for the blind forfeiture of meritorious causes of action. Its purpose is to limit the burden a plaintiff may impose upon the judicial system and upon prospective defendants on account of a single injury. For this reason, it is not triggered by any and every judgment or other judicial act terminating a lawsuit. Rather there are distinct conditions for its application: there must have been a prior adjudication of the *same cause of action* (*People v. Barragan* (2004) 32 Cal.4th 236, 253 [9 Cal.Rptr.3d 76, 83 P.3d 480]); the prior adjudication must have resulted in a *valid judgment on the merits* (*People v. Barragan, supra*, 32 Cal.4th at p. 253; Rest.2d Judgments, § 17); that judgment must be *final* (*People v. Barragan, supra*, 32 Cal.4th at p. 253); and the party against whom the bar is asserted must have been a *party, or in "privity" with a party*, to the first proceeding (*id.* at p. 253, italics added).

■ Whereas claim preclusion bars only the relitigation of a particular *cause of action*, the second aspect of res judicata—issue preclusion—bars the relitigation of *specific issues* that were actually litigated in an earlier proceeding and decided adversely to the party against whom the doctrine is asserted. (Rest.2d Judgments, § 27, coms. a, b, pp. 250–252; see *Mycogen Corp., supra*, 28 Cal.4th at p. 896, quoting *Lucido v. Superior Court* (1990) 51 Cal.3d 335, 341 [272 Cal.Rptr. 767, 795 P.2d 1223] (*Lucido*) ["issue preclusion[] 'precludes relitigation of issues argued and decided in prior proceedings' "]; *Le Parc Community Assn. v. Workers' Comp. Appeals Bd.* (2003) 110 Cal.App.4th 1161, 1171 [2 Cal.Rptr.3d 408].) For this doctrine to be successfully invoked, the issue as to which it is asserted must be "identical" to one presented in the first matter (*People v. Carter* (2005) 36 Cal.4th 1215, 1240 [32 Cal.Rptr.3d 838, 117 P.3d 544] (*Carter*)); the issue must have been "actually litigated in the former proceeding" (*Lucido, supra*, 51 Cal.3d at p. 341); the issue must have been "necessarily decided" in that proceeding (*ibid.*); the former proceeding must have resulted in a " ' "final judgment" ' " (*Carter, supra*, 36 Cal.4th at p. 1240); the judgment must have been " ' "on the merits" ' " (*ibid.*; see *Lucido, supra*, 51 Cal.3d at p. 341); and the party against whom the doctrine is asserted must have been a party, or in privity with a party, to the prior proceeding (*Carter, supra*, 36 Cal.4th at p. 1240). Further, even if all these conditions are present, the doctrine will not be applied "if injustice would result or if the public interest requires that

relitigation not be foreclosed." (*Consumers Lobby Against Monopolies v. Public Utilities Com.* (1979) 25 Cal.3d 891, 902 [160 Cal.Rptr. 124, 603 P.2d 41].)

With these basic principles in mind, we consider whether any of the various orders identified by respondents operated to bar appellant from presenting her own claim against the estate and, when that claim was denied, filing a civil action to secure her claimed one-quarter of decedent's assets.

### B. *Pleading Orders*

Respondents assert that appellant's claims are barred by Judge Levinger's order denying her motion to intervene or join in the consolidated actions. Respondents have never troubled to demonstrate that this was a final judgment on the merits. They have repeatedly pointed out that appellant failed to appeal from that order, but they have never attempted to demonstrate that she could have done so. In fact the implicit assertion of appealability is flatly incompatible with their own argument to Judge Levinger that the motion lacked merit because appellant was "already a party to the proceeding," i.e., that intervention would be *superfluous* because she was already before the court in the other consolidated proceedings. An order denying intervention is appealable only if it "finally and adversely determines the right of the moving party to proceed in the action . . . ." (9 Witkin, Cal. Procedure, *supra*, Appeal, § 70, p. 126.) If appellant was already otherwise a party, as respondents insisted, then the denial of her motion for joinder did not finally determine her right to participate in the action, let alone her substantive rights. It therefore could not have been appealed by her, and could have no preclusive effect on her later attempts to pursue her claims.

Respondents have also suggested at various times that appellant's complaint was barred by the trial court's orders (1) striking her cross-complaint in the consolidated actions, and (2) denying her motion for leave to file such a cross-complaint.[15] That contention is plagued by numerous infirmities, of which the most briefly stated is that those orders are presently on appeal and therefore have never acquired the finality necessary to give them preclusive effect. "A judgment or order may be final in nature, but it does not become res judicata until it is final in the other sense of being free from direct attack. Hence, while an appeal is pending or, though no appeal has yet been taken, the time for appeal has not expired, the judgment is not conclusive." (7

---

[15] This point is not clearly pressed on appeal, though counsel may intend to allude to it by the following assertion in his brief: "Appellant cannot avoid the bar of her default by . . . filing [a] constructive trust action . . . that alleges the same causes of action set forth in Patricia's constructive trust action . . . and in the other complaints and cross-complaints that she filed and attempted to file in Santa Clara County Superior Court."

Witkin, Cal. Procedure, *supra*, Judgment, § 307, p. 857.) Indeed, we have today dismissed that appeal (*Ferraro v. Ferraro, supra,* H030206) on the ground that those orders were *not* appealable for reasons there stated.

### C. *"Default Judgment"*

The short answer to respondents' allusions to a preclusive "default judgment" is that no such judgment appears to have been entered. Although the clerk purported to enter a default (see pt. II.D., *post*), the only arguable judgment in these matters is Judge Levinger's stipulated order.[16] Any direct attempt by respondents to characterize this as a default judgment would tend to reveal that it was not only *not* a default judgment as contemplated by the code, but was a creature wholly outside our laws and procedures, and thus wholly ineffectual to bar appellant's claims (see pt. II.E., *post*).

▇ Nothing in this record can be viewed as a default judgment. Code of Civil Procedure section 585 (section 585) prescribes the means by which such judgments are obtained. As relevant here it sets forth two alternative procedures, depending on the nature of plaintiff's action. The first deals with actions "arising upon contract or judgment for the recovery of money or damages only . . . ." (§ 585, subd. (a).) In such a case, after the defendant fails to plead, the plaintiff may apply for a default, whereupon the clerk "shall enter the default of the defendant . . . and immediately thereafter enter judgment for the principal amount demanded in the complaint . . . ." (*Ibid.*) For at least three reasons, this provision was inapplicable here: Patricia's complaint did not arise solely in contract, it did not assert any cause of action against appellant, and neither it nor any later pleading demanded a "principal amount," or any amount, from her. Not surprisingly, the clerk did not enter, and was apparently not asked to enter, a default judgment.

The second prescribed procedure, which applies in all actions other than those covered by the foregoing provision, empowers the clerk to enter the nonpleading defendant's default, but requires that any *judgment* be entered by the court after what is commonly called a prove-up of the allegations of the complaint. That is, the plaintiff must first secure the clerk's entry of default

---

[16] Respondents take exception to our characterization of this instrument as a "stipulated order" in our invitation for supplemental briefing. As usual, the reasoning underlying the objection is inexplicit. Apparently they mean that the order was not "stipulated" because (1) it varied in some respects from the form of order attached to the parties' settlement agreement, and (2) it was made after a hearing at which appellant was permitted to be heard. In referring to it as a stipulated order, we mean that it rested entirely on the settling parties' stipulation, i.e., the court had before it no other basis whatsoever on which to make such an order, and certainly no basis on which to adjudicate appellant's rights. Without the stipulation there would and could have been no order. That the court directed certain alterations in form has no effect whatever on the essential nature of the order.

and then "apply to the court for the relief demanded in the complaint," whereupon "[t]he court shall hear the evidence offered by the plaintiff, and shall render judgment in the plaintiff's favor for that relief, not exceeding the amount stated in the complaint . . . as appears by the evidence to be just." (§ 585, subd. (b).) Had respondents sought such a judgment here, it would have become painfully apparent that Patricia's complaint "demanded" no "relief" from appellant and therefore could not sustain a default judgment against her. This would have brought down the procedural stack of cards on which the settling parties' demand for an order extinguishing appellant's claims largely depended, for as appears in the following part, the peculiar alignment of the parties meant not only that a default *judgment* was unwarranted, but that even the clerk's entry of default was wholly improper and ineffectual.

### D. *Default*

A clerk's entry of default possesses none of the characteristics of a preclusive judgment. It is not final; it is not on the merits; it does not decide anything; it results from no litigation of any issue. Indeed it does not *adjudicate* anything; it is not a judicial act. It reflects the clerk's performance of a series of quintessentially clerical tasks: ascertaining that the request for default appears in order, confirming that the defendant's time to plead has elapsed, noting the absence of a responsive pleading by him, and signifying these facts by entering the default. As appellant correctly asserts and respondents sometimes appear to concede (see fn. 14, *ante*), such an instrument can have no effect under the rules of preclusion by judgment.

Here the clerk's default lacked preclusive effect for the further compelling reason that it was *void*. Appellant was not vulnerable to a default in Patricia's action because she was only nominally a defendant; she was in substance a plaintiff against whom no ground for an adverse judgment was pleaded and from whom no relief was sought. According to the allegations of the complaint, she stood in *exactly the same position as Patricia*, the named plaintiff. The core of Patricia's cause of action was the alleged agreement between decedent and Pat whereby, "upon the death of the last survivor, all of their estate properties and assets would be left equally to *the four children*," i.e., Susan, Michael, Patricia, and appellant. (Italics added.) The complaint suggested no basis on which this agreement might operate to Patricia's benefit but not appellant's. On the contrary, it expressly alleged that the agreement was made "for the benefit of plaintiff and plaintiff's sister," that decedent "breached said contract and eliminated plaintiff and plaintiff's sister as heirs to said properties and assets," that decedent had assured Patricia that "plaintiff and plaintiff's sister would share equally with the children of Jane E. Ferraro in all of the properties and assets upon her death," that

decedent "violate[d] said trust and breach[ed] the agreement [by] excluding plaintiff and plaintiff's sister" from her estate, that respondents "knew or should have known of plaintiff's claim and the claim of plaintiff's sister," that Susan "intended to exclude plaintiff and plaintiff's sister" by various acts and transactions, and that certain transfers were made "to the exclusion of plaintiff and plaintiff's sister." So far as its allegations indicated, Sandra possessed a claim against defendants substantially identical to Patricia's.

The whole predicate for taking appellant's supposed default was that appellant was joined in Patricia's complaint as a *defendant* rather than a plaintiff. This was accomplished, however, only by invoking the procedure authorized by Code of Civil Procedure section 382 (section 382), which as relevant here provides, "If the *consent* of any one who *should have been joined as plaintiff cannot be obtained*, he may be made a defendant, *the reason thereof being stated* in the complaint . . . ." (Italics added.) The caption of Patricia's complaint listed appellant as a defendant, stating that she was "named herein as a necessary party, because she *has not joined* as a plaintiff." (Italics added.) An introductory paragraph came slightly closer to the statutory language, describing appellant as "named as a necessary party, because she has *not consented* to be joined as a plaintiff." (Italics added.) Nothing in the complaint complied with the statutory conditions that the joined party's consent to join as plaintiff "*cannot* be obtained" and that "the reason thereof be[] stated in the complaint . . . ." (§ 382, italics addded.)

This was not a mere pleading error; it is quite apparent from the declarations of appellant, Patricia, and Patricia's attorney that appellant would have been more than willing to join the suit as a plaintiff, and indeed actively sought to do so, but was actively discouraged—to put it mildly—by Patricia, as assisted at least passively by the latter's attorney. In support of her motion for joinder or intervention, appellant declared that during the months after she was served she was homeless, destitute, unable to work or attend to her affairs, and under distress from several identified causes. She communicated her situation to her sister Patricia as well as to Attorney Mezzetti. She declared that she asked the latter what she should do about the papers served on her but he refused to talk to or advise her. She declared that when she asked Patricia if she could join the suit, Patricia said that she had "called Mr. Mezzetti and that I could not."[17] She also declared that after she learned of an effort to take her deposition she contacted respondents' attorney, Michael Desmarais, describing her situation, and that he told her to "hang in there."

---

[17] Patricia denied ever telling appellant that "I *would* call Mr. Mezzetti," but did not controvert the averment quoted in the text.

In a responding declaration, Mezzetti acknowledged that promptly after appellant was served, his office received a series of messages in which she expressed a desire to pursue her claims against the estate. Memoranda of these calls were made exhibits to the declaration.[18] In the earliest of them, an attorney representing appellant in another matter called Mezzetti's office on July 21, 2004—six days after appellant was served with Patricia's complaint—and left his number, saying that he was calling at appellant's request, but did not know why, describing appellant as "kind of scattered." Two days later appellant herself called and left a message for Mezzetti that attorney Thomas Salciccia was trying to reach him, and that appellant "need[ed] to get on plan [*sic*] with [her] sister." About a half hour later she called again to say, as apparently taken down by a receptionist, "Faxed papers to Tom Salccia [*sic*] get papers ready for her to sign to be on with sister." Four days later she called again, saying, "Tom has been trying to get ahold of you wants appt—getting dangerous for her." The following day, July 28, she left a recorded voice mail laced with obscenities and threats of suit, the gist of which was that she objected to Mezzetti's failure to communicate with her.

Mezzetti declared that in response to appellant's entreaties he "advised her I would not represent her in this action and that she should seek other counsel." He gave no indication that he attempted or offered to cooperate with such other counsel, and indeed did not contradict the plain implication of her final phone message, which was that he had refused or neglected to do so. His client, Patricia, declared that when appellant came to see her, they "talked about the fact that [appellant] was *not a party to this particular lawsuit as a party plaintiff* as I did not want to be involved with her in any matters, not the least of which was a lawsuit." (Italics added.) Patricia further declared, "I told her she was *not a party to my lawsuit* and I did not want her to be involved in my life in any way." (Italics added.)

By so conducting themselves, Patricia and her attorneys turned section 382 on its head. The statute's purpose is to protect the active parties to a lawsuit by effecting the *involuntary joinder* of a *recalcitrant plaintiff*. This ensures that the party so joined will be bound by any resulting adjudication. But here the statute was used to confer an involuntary "defendant" status on one who was not only willing but obviously eager to join as a plaintiff. The status thus improperly imposed on her was relied upon to finagle a default from the clerk. The default in turn became the central basis for later arguments that she had no further rights in the matter, substantive or procedural.

---

[18] As set forth in footnote 25, *post*, respondents' counsel omitted the exhibits from an augmentation we directed him to file after he alluded to these materials in his brief.

No known authority can sustain such a strategy. On the contrary, the most pertinent authorities establish that the default would have been void even if appellant had been *properly* joined under section 382. For at least 95 years it has been held that one so joined is a defendant in name only; he or she is " 'in reality' " a plaintiff. (*Romero v. Pacific Gas & Electric Co.* (2007) 156 Cal.App.4th 211, 215 [67 Cal.Rptr.3d 236] (*Romero*); *Stiles v. Estate of Ryan* (1985) 173 Cal.App.3d 1057, 1063 [219 Cal.Rptr. 647]; see *Watkins v. Nutting* (1941) 17 Cal.2d 490, 498 [110 P.2d 384]; *Gilmore v. Los Angeles Ry. Corp.* (1930) 211 Cal. 192, 200 [295 P. 41]; *Donohoe v. Wooster* (1912) 163 Cal. 114, 116–117 [124 P. 730]; *Bosworth v. Superior Court* (1956) 143 Cal.App.2d 775, 778 [300 P.2d 155] [administrator named under section 382 was "in legal effect, a plaintiff"].) For at least 60 years it has been settled that a default cannot properly be entered against such a "defendant." In *Watkins v. Nutting, supra,* 17 Cal.2d 490, the trial court granted a wrongful death plaintiff's request to order the default of two heirs whom the plaintiff had joined as defendants on the ground that, as stated by counsel, " 'they did not choose to join as plaintiffs in the action.' " (*Id.* at p. 496.) Apparently without moving to set aside the default, the heirs appeared and asserted a right to relief against the widow, the real defendants, or both. The widow argued, among other things, that the heirs' claims were barred because "a defendant, against whom a default has been entered, has no standing in court until the default has been set aside, and . . . a default by an heir at law, joined as a defendant under section 382 of the Code of Civil Procedure in a wrongful death action, operates as a waiver by such heir of any claim for damages." (*Id.* at pp. 497–498.) The court rejected these contentions as follows: "The fact that the children . . . were joined as defendants does not alter the essential relations between the parties; although named as defendants they are, in reality, plaintiffs in the case. [Citation.] No judgment could properly be taken against them because no relief was demanded from them, and the order of the court directing the clerk to enter their default was *ineffective for any purpose.*" (*Id.* at pp. 498–499, italics added; see *Estate of Kuebler v. Superior Court* (1978) 81 Cal.App.3d 500, 504 [146 Cal.Rptr. 481]; *Smith v. Premier Alliance Ins. Co.* (1995) 41 Cal.App.4th 691, 697 [48 Cal.Rptr.2d 461].)

Perhaps sensitive to the peculiarity of a default entered against a de facto coplaintiff, the settling parties repeatedly told the court below that appellant was "an adverse party" in Patricia's civil action.[19] This claim, which is not reiterated on appeal, finds absolutely no support in the substantive allegations

---

[19] More precisely, counsel persuaded Judge Yonts of this point in seeking to abate appellant's Santa Cruz action, and then cited his gratuitous ruling on the subject as a basis for preventing her from pursuing her claims in any forum. But a ruling less qualified to be given preclusive effect would be difficult to find. Judge Yonts entered an order *staying* that action on the ground that there was already another action, i.e., Patricia's civil action, pending on the same cause of action. That ruling was not a judgment in itself *and could not support a*

of the complaint. As we have already noted, all allegations of operative facts placed appellant in a position substantially identical to Patricia's. There was no suggestion that she had somehow forfeited the rights Patricia alleged were vested in both of them by decedent's promises to Pat. The claim of adversity necessarily depended on the inclusion, in the prayer of Patricia's complaint, of a request for "[r]elief as against SANDRA LYNN WISE (FERRARO) as to any relief obtained to the extent and benefits herein . . . ." This unintelligible sentence fragment may convey a desire on the part of the pleader to keep open some hope of distinguishing between the two sisters, but it is so garbled that one might reasonably suspect it to be the product of some unguessable scrivener's error. Neither counsel for Patricia (who drafted it) nor counsel for Susan and Michael (who relied upon it) ever tried to explain it. Whatever it was intended to mean, it was wholly ineffectual to sustain a judgment against appellant, by default or otherwise.

█ In a contested action a defective or even missing prayer is not fatal to recovery because, so long as the defendant answers the complaint, "the court may grant . . . any relief consistent with the case made by the complaint and embraced within the issue." (Code Civ. Proc., § 580, subd. (a).) The meaning of this language is that the court may grant such relief—but only such relief—as is " 'authorized by the facts alleged and proved or admitted . . . .' " (*Estrin v. Superior Court* (1939) 14 Cal.2d 670, 676 [96 P.2d 340]; see *Potrero Homes v. Western Orbis Co.* (1972) 28 Cal.App.3d 450, 456 [104 Cal.Rptr. 633].) Here there was no "case made by" Patricia's complaint—no "facts alleged and proved or admitted"—that would sustain any remedy against appellant. The nebulous allusion to relief "as against" her had no legal effect.

█ The point is even stronger if viewed within the framework of the relief available by default. Such relief is limited by statute to the *specific demands* set forth in the prayer. " '[I]t is a well-established rule that in a default case the relief granted cannot exceed the prayer. [Citations.] And

---

*judgment* since it manifestly was not final in any sense of the word. (See *Zisk v. City of Roseville* (1976) 56 Cal.App.3d 41, 47–48 [127 Cal.Rptr. 896]; *Beehler v. Beehler* (1979) 100 Cal.App.3d 376, 384 [161 Cal.Rptr. 30].)

Moreover Judge Yonts's finding of adversity was *incompatible with the premise of the order he made*. If Patricia's complaint asserted a cause of action *against* appellant, then it obviously did not assert the same cause of action appellant was trying to assert, which (needless to say) was entirely in her own favor. Patricia could not, in a single breath as it were, assert appellant's cause of action *for* her, and yet assert a cause of action *against* her. Even if the complaint had purported to state two causes of action—one on appellant's behalf and one against her—the adversity established by the latter claim would preclude a finding that Patricia was an adequate representative of appellant's interests. Appellant would therefore be entitled to independently pursue her own claims. (See *Colvig v. RKO General, Inc.* (1965) 232 Cal.App.2d 56, 73 [42 Cal.Rptr. 473] [test for abatement is whether judgment in prior action would bar subsequent suit]; p. 544, *post* [prior judgment a bar only if party to be barred was in privity with party in first action; privity requires adequate representation of absent party's interests].)

where relief is given beyond the scope of that asked for, it is a nullity, and may be attacked collaterally, or its effect avoided under the doctrine that it is not res judicata.' " (*Burtnett v. King* (1949) 33 Cal.2d 805, 809 [205 P.2d 657], italics omitted; see *Greenup v. Rodman* (1986) 42 Cal.3d 822, 826 [231 Cal.Rptr. 220, 726 P.2d 1295] ["[A] default judgment greater than the amount specifically demanded is void as beyond the court's jurisdiction."]; Code Civ. Proc., § 412.20, subd. (a)(4) [prescribed form of summons warns defendant that upon failure to file timely response, the plaintiff may secure his or her default and "apply to the court for the *relief demanded in the complaint*" (italics added)].)

The relief allowable by default is limited not only by the prayer but by the *substantive allegations* of the complaint. Under the "well pleaded" complaint rule, it is error to enter a default judgment on a complaint that fails to state a cause of action against the defaulting defendant. (6 Witkin, Cal. Procedure, *supra*, Proceedings Without Trial, § 160, p. 574.) If the complaint, though defective, " 'apprises the defendant of the nature of the plaintiff's demand,' " the entry of default is merely erroneous, not void. (*Molen v. Friedman* (1998) 64 Cal.App.4th 1149, 1154 [75 Cal.Rptr.2d 651]; see *id.* at p. 1156.) But Patricia's complaint fell far short of apprising appellant of the nature of any relief that Patricia might seek against her, let alone its basis. The complaint therefore could not have supported a default judgment even if Patricia had tried to obtain one, which she did not.

It thus appears that not only would any "default judgment" against appellant have been void, the default itself was void. For these and the other reasons noted above, no preclusive effect could flow from it.

E. *Order Extinguishing Claims*

1. *Introduction*

This brings us to what should have been the only question under this heading: whether appellant's claims are barred by the court's explicit order decreeing that "[n]o part of the Trust or the estate shall be distributed and paid to [appellant] Sandra Lynn Wise Ferraro." The threshold difficulty in answering this question is the sui generis nature of the order. At the time of its entry there were at least 10 matters pending in connection with decedent's erstwhile property: (1) Susan's original probate petition in Santa Cruz County to determine the existence of a trust; (2) Patricia's civil action in Santa Clara County, essentially to impose a constructive trust on respondents individually and as trustees; (3) Patricia's cross-petition, of unknown tenor, in the Santa Cruz trust matter; (4) Patricia's probate petition in Santa Clara county for letters of special administration; (5) Susan and Michael's petitions in that same matter to probate decedent's will; (6) their simultaneous petitions to administer decedent's estate and for letters testamentary; (7) Patricia's contest

of the will in that matter; (8) appellant's suit in Santa Cruz County, which by this time had been abated, but not dismissed; (9) Judith Montoya's separate and distinct civil action; and (10) appellant's motion to intervene or be joined in the consolidated actions. In an ex parte order previously described, the court had consolidated all of the Santa Clara matters, i.e., Patricia's and Judith's civil actions and "Santa Clara County Superior Court action number 1-04-PR-156503," the case number under which four of the above probate petitions had been filed. Counsel thus succeeded in creating a procedural monster—a sort of jurisprudential chimera—that might be characterized in any of a dozen ways.[20] No attempt was ever made to show how the order purporting to extinguish appellant's claims might be viewed as a judgment or appealable order, with preclusive effect as to appellant, in *any* of the consolidated proceedings. The apparent strategy was to cast the burden of classifying the order, and ascertaining its effect, on appellant. This strategy obviously succeeded in obscuring the issues, but it must ultimately fail, for under no proper conception of the order did it possess all the characteristics necessary to give it preclusive effect.

### 2. *Effect of Stipulated Order*

■ The directive that appellant should take nothing against the estate rested entirely on the stipulation of the settling parties. Such an order may have preclusive effect *as between the parties* to the underlying stipulation, but not because it satisfies the criteria for claim preclusion or issue preclusion. Rather it is binding on the parties to the extent they have *consented* to be bound by it. Thus in *Avery v. Avery* (1970) 10 Cal.App.3d 525, 529 [89 Cal.Rptr. 195], the court wrote that "[t]he judgment of a court of competent jurisdiction entered upon a stipulation of the parties has the same effect as if the action had been tried on the merits." But the court went on to describe the defendant as having "*consented to* an adjudication adverse to him" (*ibid.*), by which he "*conceded* that '$12,500.00 as alimony in gross is due, owing and unpaid' and *consented to be bound* to pay the same" (*id.* at p. 530, italics added).

In *California State Auto. Assn. Inter-Ins. Bureau v. Superior Court* (1990) 50 Cal.3d 658 [268 Cal.Rptr. 284, 788 P.2d 1156] (*Cooper*), the court relied heavily on concepts of consent in explaining why a defendant's entry into a stipulated judgment in favor of a personal injury plaintiff constituted a "conclusive judicial determination of the [defendant's] liability" for purposes of a suit by the injured plaintiff against the defendant's insurer. (*Cooper, supra,* 50 Cal.3d at p. 662, quoting *Moradi-Shalal v. Fireman's Fund Ins. Companies*

---

[20] "The Chimaera was a fearful monster, breathing fire. The fore part of its body was a compound of the lion and the goat, and the hind part a dragon's. It made great havoc in Lycia . . . ." (Bulfinch's Mythology, Monsters, ch. xvi <http://www.sacred-texts.com/cla/bulf/bulf15.htm> [as of Mar. 27, 2008].)

(1988) 46 Cal.3d 287, 306 [250 Cal.Rptr. 116, 758 P.2d 58], italics omitted.) The court noted that "[i]n a stipulated judgment, or consent decree, *litigants voluntarily terminate* a lawsuit by *assenting* to specified terms, which the court agrees to enforce as a judgment." (*Cooper*, at p. 663, italics added.) Such judgments "bear the earmarks both of judgments entered after litigation and contracts derived through *mutual agreement*." (*Ibid.*, italics added.) Thus "a stipulated judgment may properly be given collateral estoppel effect, at least when the parties *manifest an intent to be collaterally bound* by its terms." (*Id.* at p. 664, fn. omitted, italics added.) In a footnote, the court acknowledged a split of authority on this point, or at least a difference of emphasis, with some states adopting a rule under which "collateral estoppel effect should not be given, except in the rare case in which it may fairly be said the parties intended such a result." (*Id.* at p. 665, fn. 2.)[21] Subsequent California cases have essentially aligned themselves with this view, concluding that "a stipulated judgment may be given preclusive effect only when the parties manifest an intent for it to do so." (*Tennison v. California Victim Comp. & Government Claims Bd.* (2007) 152 Cal.App.4th 1164, 1176 [62 Cal.Rptr.3d 88]; see *Landeros v. Pankey, supra*, 39 Cal.App.4th at p. 1172.)

It should go without saying that to grant a stipulated judgment preclusive effect against a complete stranger to the stipulation would raise grave due process concerns. It would amount to the determination of that person's rights without adjudication or hearing, based on nothing more than the agreement by other persons that his or her rights should be extinguished. Short of trial by ordeal or lottery, it is difficult to conceive of a regime more offensive to fundamental notions of fairness. (See *Mullane v. Central Hanover Tr. Co.* (1950) 339 U.S. 306, 314 [94 L.Ed. 865, 70 S.Ct. 652] [" 'The fundamental requisite of due process of law is the opportunity to be heard.' "]; *County of Ventura v. Tillett* (1982) 133 Cal.App.3d 105, 112 [183 Cal.Rptr. 741], disapproved in part in *County of Los Angeles v. Soto* (1984) 35 Cal.3d 483, 492, fn. 4 [198 Cal.Rptr. 779, 674 P.2d 750] ["Due process requires that all

---

[21] The court alluded to collateral estoppel as barring "subsequent litigation of all issues which were or could have been raised in the original suit." (*Cooper, supra*, 50 Cal.3d 658 at p. 665, fn. 2.) It thus succumbed, and sadly contributed, to a strain of seemingly ineradicable confusion over the distinctions between "res judicata" (claim preclusion) and "collateral estoppel" (issue preclusion). As we have noted, issue preclusion applies only to particular issues that were *actually litigated* in the earlier matter. (Rest.2d Judgments, § 27; *Landeros v. Pankey, supra*, 39 Cal.App.4th at p. 1171; *Gottlieb v. Kest* (2006) 141 Cal.App.4th 110, 148 [46 Cal.Rptr.3d 7].) *Claim preclusion* extends to all *legal theories, proofs, and demands for relief* that might have been presented in the first matter, provided both suits assert the *same cause of action*. (See *Mycogen Corp., supra*, 28 Cal.4th at p. 897; *Burdette v. Carrier Corp.* (2008) 158 Cal.App.4th 1668, 1687 [71 Cal.Rptr.3d 185].) Of course, settling parties might agree between themselves to foreswear future litigation of any issue they chose, and if the agreement were otherwise enforceable, it might be said to "preclude" such litigation. But this effect would flow from contract law, not the law of judgments. (See Rest.2d Judgments, § 27, reporter's notes, p. 269.)

parties be notified of the facts and issues in dispute, that each party be afforded a fair opportunity to present evidence in open court, and that judgment be rendered based on an evaluation of the evidence on each side, findings of fact and conclusions of law."]; *Bronco Wine Co. v. Frank A. Logoluso Farms* (1989) 214 Cal.App.3d 699, 717 [262 Cal.Rptr. 899] ["Rendering a judgment for or against a nonparty to a lawsuit may constitute denial of due process under the United States and California Constitutions" "because the nonjoined party has not been given notice of the proceedings or an opportunity to be heard"].)

▮ Thus, while a judgment by stipulation may have preclusive effect on a party to the stipulation—to the extent that he or she has manifested assent to such effect—it can have no such effect on a stranger, who has manifested no such thing. Appellant was not a party to the stipulation. Therefore, unless she can be viewed as assenting to the settlement through someone with whom she was in privity, she cannot be bound by the stipulated order.

### 3. *Party or Privy*

Although appellant was unquestionably a party to Patricia's civil action, respondents have never demonstrated that she was a party, or in privity with a party, to any of the probate proceedings. In Patricia's will contest she identified appellant as an "heir" of the estate; this seemingly entitled appellant to personal service of process in the will contest. (Prob. Code, §§ 8250, subd. (a), 8110.) We find no indication in the record that appellant received any notice, of any kind, of the will contest.

Indeed evidence that appellant received notice of any probate pleadings is at best extremely weak. Certainly there is no suggestion of notice to her of the Santa Cruz trust proceeding. As for the Santa Clara probate proceedings, the initiating pleading—Patricia's December 2004 petition for letters of special administration—includes a "list of parties" showing an address for appellant on Lindmuir Drive in San Jose. The attached proof of service, however, reflects mailing of a copy of the petition, ostensibly to appellant, but at an address on Highland Drive in San Jose. This confusion reverberates throughout the proceedings—or such of them as show any attempt at all to give notice to appellant. Patricia's two notices of lis pendens, filed July 8, 2004, show mailing to appellant at the Lindmuir Drive address. Susan and Michael's petition to administer estate, of December 14, 2004, shows mailing to appellant at the Highland Drive address. As late as February 7, 2006, counsel for Patricia was still serving some papers on appellant at the Lindmuir Drive address. Other documents, including respondents' petition for probate of will and issuance of letters testamentary, contain no evidence of notice to appellant at any address. Appellant declared that she was homeless during most or all of this period and that the other parties, or their attorneys, knew this. Nearly a year after the will contest was filed, and after the settling

parties had petitioned the court to approve the stipulated order purporting to extinguish appellant's rights, she declared that she had been "unaware that there was any proceeding pending concerning the estate of Jane Ferraro until days ago when my attorney advised me of this fact." None of the settling parties challenged the veracity of that statement.[22]

Respondents' attorney represented to Judge Levinger that appellant had been "a party to the proceedings, both the probate proceedings and the civil proceedings since they were filed when default was taken." No attempt was ever made to substantiate this tortured and misleading assertion.[23] Indeed, we have taken judicial notice of an order by yet another judge of the trial court in which he explicitly found that appellant was "not a party to the action of Case No. 1-04-PR-156503 [i.e., the Santa Clara probate proceeding] because this Court denied [her] motion for joinder or for leave to file a complaint in intervention." Far from challenging this order, respondents happily relied upon it not only as a basis for an award to them of $1,800 in sanctions, but as another instance where, as their counsel told Judge Elfving, yet another judge had "rejected the same arguments and the same authorities that Sandra has cited in her points and authorities in opposition to her motion to strike her complaint in this action."[24]

---

[22] In our invitation to submit supplemental briefs we posed the question whether the trial court could "properly find mailed notice of any probate pleading to appellant" given the serving parties' use of two different addresses and appellant's uncontested averment that she was homeless. In response, counsel for respondents asserted only that the court properly found "mailed notice of the *petition to approve the settlement* . . . ." No attempt was made to show that appellant was properly served with any of the preceding pleadings.

[23] The statement seemed to imply that appellant's default in the civil action—which of course was not taken when *that matter* was filed, but nearly four months later—somehow bled over into the probate proceedings. This is an insupportable implication, since a default in one matter has no tendency of its own force to prevent the defaulted party's appearance in a separate matter. Nor has it ever been suggested that the procedures for entry of default in civil cases—which as already noted were grievously misused here—have any bearing on a party's status in related probate matters.

[24] In our original opinion we suggested that when counsel included this order among 18 exhibits to his declaration before Judge Elfving, he left out its third page, which states its actual rationale. The third page did not appear in the clerk's transcript, and its omission by counsel appeared consistent with his omission of the exhibits to Mr. Mezzetti's declaration when he submitted that document to us at our direction. In a petition for rehearing, however, counsel challenges our characterization of his conduct toward Judge Elfving, insisting that he filed the order in its entirety. In addition to submitting a declaration to that effect, he requests judicial notice of related documents including his proof of service of the declaration to which the order was attached. He points out that although the proof of service bears its own "filed" endorsement by the superior court clerk, it too is missing from the transcript on appeal and from the superior court's file. He surmises that the last pages of his declaration were lost during preparation of the record on appeal. While we can think of other explanations for this evidence, these circumstances raise enough questions about counsel's conduct on this occasion to warrant withdrawal of our original characterization.

█ If appellant was not a party to the probate proceedings, she was certainly not in privity with a party. Modern conceptions of privity are infused with due process concerns, requiring not only an " ' " 'identity or community of interest,' " ' " but " ' " 'adequate representation' " ' " of the party to be bound by the party in the first action. (*Gottlieb v. Kest, supra,* 141 Cal.App.4th at p. 150, italics omitted.) Here, a community of interest existed between appellant and her sister, Patricia. But it requires no " ' " 'close examination of the circumstances of [the] case' " ' " (*ibid.*) to discern that long before the stipulated order was entered, Patricia had not only explicitly refused to represent appellant's interests, but had taken a position and adopted a strategy inimical to them. Thus Patricia had misused the procedure made available by section 382 to join a willing coclaimant as an involuntary *defendant*; she then misused section 585 to take a default against that "defendant"; she then joined the other settling parties in raising the bogus default as a bar to appellant's being heard on the merits.

█ Again, it was respondents' burden to establish in the trial court that the order purporting to extinguish appellant's claims possessed the characteristics necessary to give it preclusive effect. This included an affirmative showing that appellant was a party, or in privity with a party, to whatever proceeding it was that respondents sought to raise as a bar. Far from carrying this burden, the present record indicates that when the parties sought to give appellant any notice at all, they vacillated between two different addresses, all the while knowing that appellant was in fact homeless. This suggests, at least, that the settling parties *did not know* appellant's actual place of residence. (See Prob. Code, § 8002, subd. (a)(3) [petition to administer estate must set out address of each heir "so far as known to or reasonably ascertainable by the petitioner"].) Under Probate Code section 1212, "if the address of the person to whom a notice or other paper is required to be mailed or delivered is not known, notice shall be given as the court may require in the manner provided in Section 413.30 of the Code of Civil Procedure." There is no indication here that any of the settling parties made any attempt to comply with this provision. Their assertion that appellant had been a party to the probate proceedings was, to put it charitably, unfounded.

### 4. *Finality in Civil Action*

Nor does it appear that, viewed as an order in Patricia's civil action, the purported extinction of appellant's claims possessed the requisite *finality*. Appellant was a de facto plaintiff in that action, which so far as this record shows, remains pending. The stipulated order purported to declare Patricia's complaint "hereby dismissed," but it also declared, in the same sentence, "Patricia Dean Ferraro Hull and Judith Montoya *shall dismiss* with prejudice all of their actions . . . ." (Italics added.) As discussed in detail in the appeal from the orders refusing to permit appellant to file a cross-complaint in that action (*Ferraro v. Ferraro, supra,* H030206), this patently self-contradictory

provision must be construed not as a self-executing dismissal of Patricia's complaint but as a directive that it shall be voluntarily dismissed by her upon fulfillment of the other conditions of settlement. The absence of an appealable judgment renders all of the orders in that action, including the stipulated order of extinction, interlocutory and incapable of sustaining a claim of preclusion.

## 5. *Ultra Vires Probate Order*

Counsel has suggested at various times that the order purporting to extinguish appellant's claims was made in an exercise of the court's probate powers. For the order to have preclusive effect, however, it would have to appear that appellant's cause of action, or an issue essential to it, had been tendered to the court, sitting in probate, and that the court, in that capacity, had adjudicated it on the merits. None of these elements is established by this record. There is no basis to conclude that appellant's cause of action, or any issue essential to it, had been tendered to the probate court by appropriate pleadings and evidence. The settling parties never specified any procedural basis for an adjudication of appellant's claims by the probate court, or for extinguishing them without adjudication. Counsel for respondents seemed to imply that the trial court had such power under its authority to approve the settlement of a *will contest*; at any rate, he repeatedly presented the court with an excerpt from a treatise discussing that power.[25] He did not provide the court with the portion of the text advising that "[a] compromise and settlement agreement should include all interested persons, so that the settlement may be complete." (Clifford et al., 3 Cal. Decedent Estate Practice (Cont.Ed.Bar 2005) Will Contests, § 22.149, p. 124 (rev. 5/07).) Implicit in this admonition and the ensuing discussion is the elementary proposition that the court's power to approve a settlement by some parties does not extend to summarily foreclosing the claims of others.[26]

---

[25] Respondents resurrect this suggestion in their supplemental brief by listing Probate Code section 8254 among the statutes authorizing the court to extinguish appellants' claims. That statute empowers a court to make "appropriate orders" and to "render judgment" in a will contest. (Prob. Code, § 8254.) As discussed elsewhere, nothing in the pleadings of Patricia's will contest tendered the issue of appellant's rights for adjudication; nor does it appear that appellant was ever joined as a party in it.

[26] The authors of the cited treatise go on to state, "If a contestant compromises, others who would have benefited by denial of probate had they joined the action are not entitled to share in the consideration for settlement of the contestant's claim. In a contest by one person, evidence that another party's contest on the same ground was settled by compromise is inadmissible because a compromise is not in the nature of an admission, and a separate compromise in no way strengthens the contestant's case before the court. [Citation.] [¶] PRACTICE TIP[:] If fewer than all the litigants settle and there is a possibility of joint tortfeasor liability, a fiduciary should consider obtaining or challenging a [Code of Civil Procedure section] 877.6 application for a good faith settlement determination, which bars any further claims against the settling tortfeasor for equitable contribution or indemnification. [Citation.]" (Clifford et al., 3 Cal. Decedent Estate Practice, *supra*, Will Contests, § 22.149,

■ On appeal counsel cites a string of statutes for the proposition that the order of extinction was a proper exercise of the probate court's "exclusive jurisdiction over the distribution of the estate among rival claimants (Prob. Code §§ 856, 857, 7050, 11603–11605, 11705)." The broadest of the cited statutes confirms the probate court's "jurisdiction of proceedings under this code concerning the administration of the decedent's estate." (Prob. Code, § 7050.) This begs the question, however, which is whether the order of extinction was the product of any "proceeding[] under this code." (*Ibid.*) We do not doubt that the probate court possesses broad powers with respect to the administration of a decedent's estate, but those powers must be exercised within the procedural framework laid out in the governing statutes. We find nothing in the code authorizing the court to extinguish the claim of a claimant on the mere stipulation of other persons interested in the estate.

In general, the court's powers over the administration of an estate are exercised by authorizing or approving acts of a personal representative who has been vested with authority to act for and on behalf of the estate. (See Prob. Code, §§ 8400, subd. (a) ["A person has no power to administer the estate until the person is appointed personal representative and the appointment becomes effective."], 9611 ["the court may authorize and instruct the personal representative, or approve and confirm the acts of the personal representative"]; cf. *id.*, §§ 8540, subd. (a) [court may appoint special administrator with powers as specified by court "[i]f the circumstances of the estate require the immediate appointment of a personal representative"], 8545 [grant of powers of personal representative to special administrator].) With respect to claims, the personal representative's power begins and ends with allowing or rejecting them. (See Prob. Code, § 9250, subd. (a) [denial of claims].) His rejection does not extinguish the claimant's substantive rights and the probate court has no power to do so on the personal representative's mere request. Rather the claimant is entitled to pursue the rejected claim in a civil suit against the personal representative. (14 Witkin, Summary of Cal. Law (10th ed. 2005) Wills and Probate, § 645, p. 729; see Prob. Code, §§ 9351–9354.) Obviously a personal representative cannot cut off this right by the simple expedient of settling with other claimants and stipulating with them to extinguish a nonsettling claimant's rights. Such an attempt, whatever else it may be, is not an act of administration within the probate court's powers of approval or ratification. The relative informality of probate procedures and the broad powers of the probate court do not license a wholesale subversion of due process.

Here no probate claim had been asserted with respect to appellant's cause of action when the court executed the stipulated order. Indeed, because no

pp. 124–125 (rev. 5/07); see also Cal. Trust & Probate Litigation (Cont.Ed.Bar 2008) Will Contests, § 17.92, pp. 626–627 [to same effect].)

personal representative had been appointed, the statutory time for submitting claims *had not begun to run.* (See Prob. Code, §§ 9100 [claim must be filed "(a) . . . before expiration of the later of the following times: [¶] (1) Four months after the date letters are first issued to a general personal representative. [¶] (2) Sixty days after the date notice of administration is [given] to the creditor."], 9051 [notice is to be given "within the later of: [¶] (a) Four months after the date letters are first issued. [¶] (b) Thirty days after the personal representative first has knowledge of the creditor"].) Susan took office as personal representative only after the court had executed the stipulated order. Appellant had tendered no claim at that time, there had been (and could be) no rejection of such a claim, and there was no one whose acts respecting such a claim, or any other matter, the court could authorize or approve.

Nor do any of the other statutes now cited so belatedly by counsel authorize the order under scrutiny. The first two concern petitions for a transfer of specific property to one claiming to own it. (Prob. Code, § 850 et seq.) No such petition was ever filed here, so no issue, let alone cause of action, was tendered to the court under those provisions. Moreover, such a petition requires (among other things) *personal service* of the initiating pleading on "[e]ach person claiming an interest in, or having title to or possession of, the property." (Prob. Code, § 851, subd. (a)(2).)

Nor can the order be viewed as the product of a proceeding for distribution of an estate. Such proceedings are governed by Probate Code sections 11600 et sequitur. The Code expressly provides that a petition seeking such an order "may not be filed unless at least two months have elapsed after letters are first issued to a general personal representative." (Prob. Code, § 11620.) Similarly, a petition "for a court determination of the persons entitled to distribution of the decedent's estate" is proper only "after letters are first issued to a general personal representative . . . ." (Prob. Code, § 11700.)[27] Since no personal representative was appointed here until after the court's execution of the stipulated order, no proceeding for distribution was *or could have been* initiated prior to that order, and the order cannot be understood as an adjudication of any such proceeding.

In their supplemental brief respondents concede that Judge Levinger's order "cannot be viewed as one for preliminary distribution . . . nor as an order determining an entitlement to distribution." Then, after alluding to several statutes as authority for the order—some cited for the first time—respondents allude to the court's supposed power "to adjudicate to whom the decedent's estate shall be distributed." Characteristically, no attempt is made

---

[27] Even where a distribution is properly made, a claimant who has not received due notice of administration can pursue his claim *against the distributee.* (Prob. Code, § 9392.)

to connect these dots. The newly cited statutes include provisions concerning administration of a *trust* (Prob. Code, §§ 17000, subd. (a), 17200), as well as statutes concerning the probate court's powers as a court of general jurisdiction (Prob. Code, §§ 800, 17000, subd. (b), 1000; Civ. Code, §§ 2223, 2224; Code Civ. Proc., § 585). But no attempt is made to show that the Santa Clara court—as distinct from the Santa Cruz court—had properly before it any issue of trust administration. As for the general powers of a superior court, we are quite satisfied that no judge sitting in a general civil department would dream of issuing the kind of order here at issue under the circumstances shown by this record. It is only the smoke and mirrors conjured by counsel through invocation of the court's *probate* powers that could have induced Judge Levinger to make such an order. In any event it is not our obligation to chase down every legal will-o'-the-wisp counsel may belatedly seek to conjure up. If it were, this litigation would never move forward, for counsel appears ready to send forth an inexhaustible supply of phantom arguments. Despite our invitation to do so, respondents have failed to dissuade us from the view that that the probate court lacked the power to extinguish appellant's claims under the circumstances reflected by this record.

Further, even if the court had the naked power to make such an order, that would not resolve the question of its *preclusive effect*. For the order to preclude appellant's later assertion of her cause of action, it would have to appear that the court *adjudicated* that cause of action or an issue essential to it. It does not appear that any such cause of action, or issue, was tendered to the court by any probate pleading. Instead the settling parties prevailed upon the court to reach out and issue a decree upon a claim that had not been placed before it. The only indication in any probate pleading that a claim might exist on appellant's behalf was Patricia's will contest, which mentioned appellant (1) in recapitulating the caption of Patricia's civil complaint; (2) in a list of "heirs of decedent"; and (3) in a copy of Patricia's complaint, which was attached to the contest. Patricia did not pray, in the will contest, for the adjudication of appellant's, Patricia's, or anyone else's claim, as such. Instead she prayed that the will proffered by Susan and Michael not be admitted to probate, that Patricia be awarded costs of suit, and "[f]or such other relief as the court deems just and proper." Nowhere did she manifest an intention to assert a cause of action in the probate court on appellant's behalf, or ask the court to extinguish such a cause of action.

Respondents have failed entirely to show that the order purporting to extinguish appellant's claims possessed preclusive effect.

### 6. *Actual Litigation of Merits*

In addition to the foregoing infirmities in respondents' claim of preclusion, they have failed entirely to show that the order extinguishing appellant's

claims reflected an adjudication of those claims *on the merits*, or that any issue essential to her cause of action was *actually litigated.* At no time was any judge asked to pass, nor did any purport to pass, upon the actual merits of appellant's cause of action, or anyone else's cause of action, or any defense to, or component of, such a cause of action. The record contains no indication whatever that any substantive issue touching on the validity of appellant's claims was ever placed before the court or decided by it.

To be sure, among the many reasons (or partial reasons) offered by counsel for respondents for spurning appellant's claims are repeated assertions that the papers before the trial court showed a lack of substantive merit in appellant's claims. At the hearing before Judge Levinger, he said, "If you don't approve the settlement, she can go ahead and file a creditor's claim. *I don't know on what basis.* I can tell you right now that *the only basis I can possibly think of would be some type of a quantum meruit,* person services contract claim, all of which is time barred under [Code of Civil Procedure] section 366.2 which . . . expires one year after the date of the decedent's death." He also suggested that appellant's claims lacked substantive merit as "basically summarized in both Ms. Patricia Ferraro's declaration and Mr. Mezzetti's declaration," i.e., "Her relationship with the decedent and the decedent's pre-deceased spouse was atrocious. There's no way in the world she will ever be able to sustain such a claim had she timely filed one and had her default not been taken and had or had relief from default been granted."

Later, in argument before Judge Hyman, counsel professed not only to find a substantive defense in the cited declarations, but to know that they furnished a ground for Judge Levinger's order. He said, "There is a substantial other evidentiary basis behind why Judge Levinger issued her rulings. There were extensive declarations filed by both Mr. Mezzetti and his client, Patricia Ferraro at the hearings before Judge Levinger, which basically showed that, as a matter of fact, as a matter of law, there is no way appellant Ferraro could prevail." Counsel reprised this line of argument before us, writing in his brief, "Finally, at the hearings on appellant's motion for joinder and respondent's motions and petition for approval of the settlement agreement, both Patricia and respondents submitted evidence as to why the court should enter an order specifically adjudicating that: 'No part of the Trust or the estate should be distributed or paid to [appellant] Sandra Lynn Wise Ferraro.' That evidence included, but was not limited to, *Patricia's declaration that neither the decedent nor her predeceased husband intended to leave appellant anything.*"[28] (Italics added.)

---

[28] Counsel went on to note that these materials had not been included in the appellate record "[a]s appellant never appealed from either of Judge Levinger's two February 2, 2006, orders . . . ." But counsel was free to make those materials part of the record either by requesting their inclusion in the clerk's transcript (Cal. Rules of Court, rule 8.120(a)(3)) or by

We considered these assertions highly relevant to the claim of preclusion, and so instructed counsel to augment the record with them. What he filed, to the extent it was responsive to our directive, was the two declarations we have previously described—sans exhibits.[29] None of the filed material supports *any* of the representations we have quoted above. Patricia never "declar[ed]" anything about her father's and stepmother's intentions; her declaration did not show that appellant had an "atrocious" relationship with either her father or her stepmother; it had scarcely any tendency at all to establish that appellant could not prosecute her cause of action to a successful end. Instead Patricia's declaration consisted of an attack on appellant's character and a catalog of Patricia's efforts to prevent appellant from participating in Patricia's lawsuit. In the most nearly relevant passages, Patricia declared that appellant had, for her "entire life," been "an extremely difficult person to deal with for my family," including their father, and that, as assertedly reflected in discovery, appellant had "sued our father during his lifetime . . . ." This might sustain an inference that any paternal affection on the part of appellant's father was sorely tested, but it hardly sufficed to controvert *Patricia's own sworn allegation* that their father had entered into an agreement with decedent "whereby upon the death of the last survivor, all of their estate properties and assets would be left equally to *the four children*," i.e., Susan, Michael, Patricia, *and appellant*. Nor did anything before the court controvert Patricia's allegation under oath that "[t]his agreement was for the benefit of plaintiff," i.e., Patricia, "and plaintiff's sister," i.e., appellant. Patricia's scattergun attack on appellant's character could not put in issue the latter's right to relief flowing directly and unequivocally from the verified allegations of Patricia's own complaint. If she and her attorney meant to impugn those allegations, it was incumbent on them to at least come forward with contradicting evidence of comparable directness and unequivocality.

Certainly no reasonable, good faith construction of the cited declarations could sustain counsel's statement to Judge Hyman that "there [was] no way

seeking to augment the record (*id.*, rule 8.155(a)). Having failed to do either, it was "patently improper" for counsel to assert these supposed facts. (*Estate of Feeney* (1983) 139 Cal.App.3d 812, 817 [189 Cal.Rptr. 84]; see Cal. Rules of Court, rule 8.204(a)(2)(C); *Stolman v. City of Los Angeles* (2003) 114 Cal.App.4th 916, 927 [8 Cal.Rptr.3d 178].)

[29] After we directed counsel to augment the record with the materials alluded to, he filed 127 pages, of which 105 were already part of the record in this or the related appeals. Of the 22 new pages, 16—consisting of the declarations of Patricia and Attorney Mezzetti, described above—were responsive to our order. However, counsel's submission omitted eight pages of exhibits attached to, and explicitly identified in, the Mezzetti declaration. At our request, the superior court transmitted those exhibits to us, and we have ordered the record augmented to include them. As set forth above, the exhibits memorialize phone messages by which, long before her default could have been taken, appellant manifested a clear desire to participate in the action.

appellant Ferraro could prevail."[30] Had there been evidence that Patricia's opinion of appellant was shared by their father, there would at least have been some basis to infer a dispossessory *motive* on his part.[31] But this would hardly be enough to sustain an adjudication contradicting Patricia's own sworn allegations. Indeed, counsel implicitly acknowledged as much at the end of his remarks, telling Judge Hyman that had Patricia's claim proceeded to an adjudication on the merits, "[i]t's *entirely possible* that Patricia Ferraro would have gotten 25 percent and appellant would have gotten absolutely nothing . . . ." This was an implied concession that *no one*'s substantive right to relief, and least of all appellant's, was tendered to, or actually litigated before, Judge Levinger. Rather appellant's rights were extinguished on the rationale that having suffered a "default" on Patricia's complaint, appellant had no right to litigate the merits.[32] The order thus rested on a *refusal* to adjudicate appellant's claims, or permit their adjudication, because of her supposed default.[33]

---

[30] Counsel could also be understood to imply to Judge Hyman that the proceeding before Judge Levinger was a full-fledged adjudication due to its length: "This wasn't an expedited hearing. There was a long drawn-out process in which counsel had full opportunity to argue why his client should not be bound by the Judgment and the order—by the order approving the settlement and the judgment implementing the settlement . . . ." Of course there was no "long drawn-out process" but only the customary exchange of papers followed by oral argument. Counsel's depiction seems particularly striking since he *did* effectively expedite the proceedings—at least he deprived appellant's counsel of another several weeks' notice—by securing ex parte, without apparent justification, an order consolidating the affected matters.

[31] Patricia went on to observe that despite appellant's supposed mistreatment of their parents, their mother had left appellant a sizable sum—which, according to Patricia, appellant squandered.

[32] Later, when again before Judge Hyman in connection with appellant's objections to the petition for final distribution, counsel for respondents asserted that it was appellant's burden to establish what had been adjudicated in prior orders: "And as Your Honor knows, those types of orders, including this order, does [*sic*] not have to set forth its findings. *You don't go back behind the order to see whether or not all of the things he said did or did not get considered or actually adjudicated.* It was his obligation to bring them up." (Italics added.) In fact of course, by suggesting that prior orders were conclusive of appellant's rights, counsel and his clients assumed the burden of establishing what "did or did not get considered or actually adjudicated" in those orders. The asserted inability to "go back behind the order" was fatal to counsel's position, not his opponent's. Implicitly acknowledging this, counsel proceeded to baldly assert that various issues had in fact been litigated and determined in various orders. Respondents' burden on this point could not be satisfied by statements of counsel that were unsworn and unsubstantiated.

[33] In their supplemental brief, respondents *concede* that appellant's claims were never adjudicated on the merits, but offer the flagrant non sequitur that this was "because appellant never appealed" from Judge Levinger's order. Similarly respondents' original brief asserts, "[A]s appellant did not appeal Judge Levinger's default judgment, she waived her argument that Judge Levinger did not take evidence as to why the court should enter an order specifically adjudicating that: 'No part of the Trust or the estate should be distributed or paid to Sandra Lynn Wise Ferraro.'" The unspoken and undemonstrated premise is that a party must appeal from an order or he or she is somehow barred from later contesting its preclusive effect. We

Respondents did not carry their burden of demonstrating that appellant's attempts to pursue her cause of action are barred by any of the orders cited by them.

### III. *Statute of Limitations*

#### A. *Code of Civil Procedure Section 473*

 Respondents contend that appellant's cause of action is barred by three "statutes of limitations." One of the cited provisions, Code of Civil Procedure section 473, subdivision (b), is not a statute of limitations at all, but a procedural time limit on seeking relief from default. Appellant's failure to seek relief within this time has no effect on her claims. As we have held, the purported default in this case was a nullity, and even if it were not, the pleadings before the court provided no basis for a *judgment* against her. The most that the default could have accomplished, were it not void, was to bar appellant from participating in a trial of the issues tendered by Patricia's complaint. It could not itself sustain or support a judgment against her, and its entry would have no apparent bearing on any issue before us, whether or not appellant had sought relief from it.

#### B. *Code of Civil Procedure Section 366.2*

 Respondents cite two genuine statutes of limitations: Code of Civil Procedure sections 366.2 (section 366.2) and 366.3 (section 366.3). The first provides in pertinent part, "If a person against whom an action may be brought on a liability of the person . . . whether accrued or not accrued, dies before the expiration of the applicable limitations period, and the cause of action survives, *an action may be commenced within one year after the date of death*, and the limitations period that would have been applicable does not apply." (§ 366.2, subd. (a), italics added.) As appellant points out, this language contemplates a cause of action that could have been asserted against the decedent while he was alive. (*Dobler v. Arluk Medical Center Industrial Group, Inc.* (2001) 89 Cal.App.4th 530, 535 [107 Cal.Rptr.2d 478] ["This uniform one-year statute of limitations applies to actions on all claims against the decedent which survive the decedent's death."]; *Levine v. Levine* (2002) 102 Cal.App.4th 1256, 1261 [126 Cal.Rptr.2d 255] [same].) Indeed this is the

---

know of no support for such a rule. The failure to appeal from an appealable order will satisfy the *finality* condition for preclusion, but if other necessary conditions are absent, it makes no discernible difference whether relief from the order was sought by appeal or otherwise. In this case, as we have concluded in *Ferraro v. Ferraro supra*, H030206, the order of extinction was not even final for purposes of appeal—at least, insofar as it might be viewed as an adjudication of appellant's claims.

square holding of *Shewry v. Begil* (2005) 128 Cal.App.4th 639, 644 [27 Cal.Rptr.3d 209], where the court concluded that "on its face, section 366.2 applies to claims that could have been brought against the decedent had he or she lived." Appellant reasons that her cause of action falls outside this class because it did not exist—no liability could arise—until decedent died without having made disposition of her property as promised to appellant's father.

This argument appears correct. One cannot properly say that a cause of action "survives" a decedent if it only comes into existence upon the decedent's death (or to be very precise, upon the decedent's having died). Further, it is not immediately apparent that section 366.3, discussed below, would have any independent effect if section 366.2 were interpreted to apply to causes of action such as appellant's. (See *Brock v. First South Savings Assn.* (1992) 8 Cal.App.4th 661, 668 [10 Cal.Rptr.2d 700] ["We are required to construe statutory language according to its ordinary and usual purport, to give effect to every word if possible, and to avoid any construction which would render all or part of a statute surplusage."].)

Respondent's response on this point is that a similar interpretation of the statute was rejected in *Battuello v. Battuello* (1998) 64 Cal.App.4th 842, 846 [75 Cal.Rptr.2d 548] (*Battuello*). Counsel implies that the court rejected appellant's reading of the statute, but in fact it explicitly *adopted* that reading, stating that the statute "governs causes of action that exist at the time of a person's death . . . ." (*Ibid.*) It rejected the plaintiff's claim there primarily on the ground that his cause of action had come into existence before the decedent's death by virtue of the decedent's transfer of property in violation of the promise on which the action was brought. (*Id.* at pp. 846–847.)

To be sure, the court went on to muddy the waters in a footnote addressing the plaintiff's argument that he could not have sued prior to the decedent's death because the transfer cited by the court was revocable. (*Battuello, supra,* 64 Cal.App.4th at p. 847, fn. 1.) The court dispensed with this seemingly potent argument by noting that under the statute, the limitations period began to run at the decedent's death "even if no cause of action had accrued prior to [the decedent's] death . . . ." (*Ibid.*) The court's interpretation of this language conflates the *accrual* of a cause of action with its *existence*. A cause of action *exists* (or "arises") when all the elements it comprises have come into being so that an action may be brought. (See *Mosesian v. County of Fresno* (1972) 28 Cal.App.3d 493, 500 [104 Cal.Rptr. 655] (*Mosesian*) ["A cause of action normally accrues when under the substantive law the wrongful act is done and the liability or obligation arises, that is, when action may be brought."].) Properly understood, "accrual" refers to the moment at which the statute of limitations begins to run against the cause of action. (See *Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 397 [87 Cal.Rptr.2d 453, 981 P.2d 79].) Ordi-

narily a cause of action accrues when it comes into existence. (*Ibid.*; *Mosesian, supra*, 28 Cal.App.3d at p. 500; see 3 Witkin, Cal. Procedure (4th ed. 1997) Actions, § 459, p. 580.) But accrual can sometimes follow existence by a substantial period. The most familiar example is a cause of action that does not accrue until the plaintiff *discovers*, or should discover, its existence. (3 Witkin, *supra*, Actions, § 463, p. 583; see *Fox v. Ethicon Endo-Surgery, Inc.* (2005) 35 Cal.4th 797, 807 [27 Cal.Rptr.3d 661, 110 P.3d 914].) Particular claims can be subject to delayed accrual on various other grounds. (See 3 Witkin, *supra*, Actions, § 462, p. 582; *Wallace v. Kato* (2007) 549 U.S. 384, 390, fn. 3 [166 L.Ed.2d 973, 127 S.Ct. 1091, 1096, fn. 3] ["While the statute of limitations did not begin to run until petitioner became detained pursuant to legal process, he was injured and suffered damages at the moment of his arrest, and was entitled to bring suit at that time."].)

Section 366.2's use of the term "survives" can readily be harmonized with its application to claims "whether accrued or not accrued" by applying the latter to reach situations where the cause of action *existed* while the decedent was alive, but had not yet *accrued* for limitations purposes—as where the decedent had perpetrated a fraud of which the plaintiff was unaware. In such a case, the decedent's death triggers the limitations period prescribed by the statute, regardless of any accrual rule otherwise governing the claim. The result is to require would-be claimants to seek out and assert any claims they might have against the decedent within a year of his death, or suffer the loss of those claims.

Reading the statute as a reference to claims that *did not exist* at the time of death burdens the statute with a glaring self-contradiction because, as already noted, it speaks in terms of an action that "survives," i.e., that might have been brought against the decedent while living. Insofar as the *Battuello* court adopted such a reading, we decline to follow it. We conclude that section 366.2 was inapplicable here, because appellant's claim could not come into existence until decedent died having failed to make provision in accordance with her alleged agreement with Pat Ferraro.

C. *Code of Civil Procedure Section 366.3*

We turn then to section 366.3, which provides in pertinent part, "If a person has a claim that arises from a promise or agreement with a decedent to distribution from an estate or trust or under another instrument, whether the promise or agreement was made orally or in writing, *an action to enforce the claim to distribution may be commenced within one year after the date of death*, and the limitations period that would have been applicable does not apply." (§ 366.3, subd. (a).)

Appellant contends that the statute does not reach her action because she does not assert "an action to enforce [a] claim to distribution." (§ 366.3, subd. (a).) Taking this phrase to mean a claim sounding in contract, she contends that her action sounds in tort (fraud) and invokes the court's equitable power to prevent unjust enrichment. She describes *Day v. Greene* (1963) 59 Cal.2d 404 [29 Cal.Rptr. 785, 380 P.2d 385] (*Day*), as "on all fours" with this case, but that is hardly accurate. The court there held that a claim like appellant's was subject to the three-year limitations period for actions sounding in constructive fraud. (*Id.* at p. 411.) But that was some 37 years before section 366.3 was enacted. The nearest parallel at that time was a statute with language substantially identical to that now found in section 366.2. (See Code Civ. Proc., former § 353.) It is sheer surmise on appellant's part that the *Day* court rejected application of that statute; the court did not mention any other statute than the one it held applicable. In any event there was no statute at that time resembling section 366.3, and the court's holding therefore cannot be viewed as authority of any kind on the scope of such a statute. Two other cases cited by appellant were also decided before the enactment of section 366.3. (See *Ludwicki v. Guerin* (1961) 57 Cal.2d 127 [17 Cal.Rptr. 823, 367 P.2d 415]; *Estate of Brenzikofer* (1996) 49 Cal.App.4th 1461 [57 Cal.Rptr.2d 401].)

 We acknowledge a certain lack of clarity in the language of the statute. Indeed the seemingly crucial phrase ("a promise or agreement with a decedent to distribution from an estate or trust") seems to be missing a verb; one does not speak of an "agreement to distribution," but either an "agreement to distribute" or an "agreement to make distribution."[34] Despite this malapropism, the intent of the phrase seems fairly clear: to reach any action predicated upon the decedent's agreement to distribute estate or trust property in a specified manner. This reflects an apparent intent to govern claims just like appellant's. It is true that appellant does not merely sue to enforce the alleged promise but also alleges that decedent committed fraud by failing to perform it, and that respondents colluded in that fraud. But the statute is not limited by its terms to contract claims; it extends to any claim that "arises from" the decedent's promise or agreement. (§ 366.3, subd. (a).) In the absence of a more cogent showing to the contrary, we must conclude that the statute applies to *all* actions predicated on a decedent's promise to make specified distributions upon his death. (See *Stewart v. Seward* (2007) 148 Cal.App.4th 1513, 1521–1523 [56 Cal.Rptr.3d 651].)

---

[34] Similarly, the phrase "distribution from an estate or trust or under *another instrument*" (§ 366.3, subd. (a), italics added) is unfortunate, since neither an estate nor a trust (as the term is used here) is an "instrument." To be sure, a trust instrument is sometimes called a "trust," but in that case a distribution is made *under* it, not "from" it. None of these misadventures in legislative drafting, however, has any apparent bearing on the issues before us.

The sole question, therefore, is whether an "action to enforce [appellant's] claim to distribution" was "commenced within one year after the date of death . . . ." (§ 366.3, subd. (a).) Decedent died on April 9, 2004. Appellant herself did not file any pleading until August 17, 2005, when she filed her complaint in Santa Cruz County asserting claims on her own behalf. Although that action was soon abated, it remained pending throughout the proceedings below and, so far as we know, remains pending today. There is no reason to doubt that it satisfied the requirement of section 366.3. However, since it was filed more than 16 months after decedent's death, it alone could not save appellant's claim from the bar of the statute.

The obvious next question is whether Patricia's civil complaint constituted the required "action to enforce [appellant's] claim to distribution." (§ 366.3, subd. (a).) Filed a mere three months after decedent's death, that action was obviously timely. It remained pending until long after appellant had filed a complaint in her own right. Indeed, as we have elsewhere concluded, it too remains pending today. Therefore if Patricia's complaint was an action to enforce appellant's claim, that claim is not barred by section 366.3.

We see no reason to doubt that Patricia's complaint satisfied the requirements of the statute of limitations. In it, Patricia alleged that decedent had breached a binding agreement to leave her estate in equal shares to Susan, Michael, Patricia, and appellant. She explicitly alleged that the agreement was for her own and appellant's benefit. She named appellant as a party under section 382, which made appellant a nominal defendant, but "in reality" and "in legal effect" a plaintiff. (*Romero, supra,* 156 Cal.App.4th 211, 215; *Bosworth v. Superior Court, supra,* 143 Cal.App.2d 775, 778.) It thus appears that in contemplation of law, and whether or not she intended it, Patricia's complaint was an action to enforce appellant's rights under the alleged agreement.[35]

▉ Respondents assert that "there is no authority for the proposition that appellant should have been treated as a plaintiff not as a defendant in Patricia's lawsuit for statute of limitations purposes especially where, as here, appellant's default was taken and appellant never moved for relief from that default." But as already noted, we find ample authority for the proposition that appellant "should have been treated as a plaintiff"—indeed, she *was* a plaintiff—in Patricia's lawsuit. Respondents have offered no reason to suppose that this principle should somehow cease to operate in the context of a

---

[35] Citing *Voyce v. Superior Court, supra,* 20 Cal.2d 479, appellant contends that her own pleadings "relate back" to the filing of Patricia's complaint. She also contends that Patricia's complaint "tolled" the statute as to her (appellant's) suit. Having reached the same destination by a somewhat different route, we find it unnecessary to reach these contentions.

statute of limitations defense. The primary purpose of statutes of limitations is " 'to promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared.' " (*Marin Healthcare Dist. v. Sutter Health* (2002) 103 Cal.App.4th 861, 872 [127 Cal.Rptr.2d 113].) True, "many other salutary purposes" have been cited in support of such statutes, including "protecting settled expectations; giving stability to transactions; promoting the value of diligence; encouraging the prompt enforcement of substantive law; avoiding the retrospective application of contemporary standards; and reducing the volume of litigation." (*Ibid.*) But countervailing factors have also been recognized: A limitations defense "buys repose at the price of disposing of a cause of action 'on procedural grounds' rather than 'on the merits' [citation]—and, in a given case, may buy it at the price of procedurally barring a cause of action that is in fact meritorious (see, e.g., *Bollinger* v. *National Fire Ins. Co.* (1944) 25 Cal.2d 399, 411 [154 P.2d 399] [stating that it might 'enable' a defendant 'to obtain an unconscionable advantage and enforce a forfeiture']; *California Sav. etc. Soc.* v. *Culver* [(1899)] 127 Cal. [107], 110–111 [59 P. 292] [stating that it might prove 'unjust and unconscionable'])." (*Norgart v. Upjohn Co., supra,* 21 Cal.4th 383, 396.)

█ Where a claim is asserted on behalf of a nonconsenting plaintiff under section 382, the major policy favoring a limitations defense will not ordinarily come into play. The true defendant cannot be "surprise[d]" by the claim because it is plainly before him or her. The de facto plaintiff's failure to consent to joinder as an active plaintiff might by itself lead the defendant to suppose that his or her claim had been abandoned, but the very purpose of joinder is to make possible an adjudication of the de facto plaintiff's rights whether or not he or she consents to joinder. Moreover, even if this consideration might favor a limitations defense where the complaint alleged that the de facto plaintiff *refused* to participate in the action, it cannot do so where, as here, the complaint lacks that allegation and all indications are that the nominal defendant fully intended to vindicate her rights. To be sure, appellant's clearest communications of this intent were apparently made to Patricia and her attorneys. The record does not establish what respondents and their attorney learned about appellant's intentions, or when. But they had before them a complaint in which a claim was asserted on her behalf against them, and had they believed she meant to abandon that claim it would seem difficult to explain the quiet stealth with which they acted to extinguish those rights. The absence of genuine surprise seems apparent from the very tardiness with which they raised the limitations defense.

█ Even if we were not otherwise convinced of the point, we would question whether respondents may be heard to contest the efficacy of Patricia's complaint to assert appellant's cause of action because any denial

that it did so is *flatly incompatible* with statements made by them to the various judges below, as well as to this court. As recited in Judge Yont's order, which respondents' counsel prepared, appellant's Santa Cruz action was stayed because it was "between the same parties, on *the same cause of action*, and seeks the same relief" as Patricia's Santa Clara action. (Italics added.) This recital was then repeatedly quoted or paraphrased to other judges in support of relief sought from them—successfully—by respondents. The clear intention of these representations was to satisfy the judges to whom they were made that a proper vehicle for presenting appellant's claims either remained pending or had would have remained pending had she not forfeited it. This representation could only be true if Patricia's complaint asserted a claim on appellant's behalf—as counsel said, "the same cause of action" she sought to assert. Counsel's representations thus trigger the doctrine of judicial estoppel, under which " ' "a party who has taken a particular position in litigation may, under some circumstances, be estopped from taking an inconsistent position to the detriment of the other party." [Citation.]' [Citation.]" (*In re Stier* (2007) 152 Cal.App.4th 63, 80 [61 Cal.Rptr.3d 181], quoting *California Coastal Com. v. Tahmassebi* (1998) 69 Cal.App.4th 255, 259 [81 Cal.Rptr.2d 321].) The doctrine comes into play when "(1) the same party has taken two positions; (2) the positions were taken in judicial or quasi-judicial administrative proceedings; (3) the party was successful in asserting the first position; (4) the two positions are completely inconsistent; and (5) the first position was not taken as a result of ignorance, fraud, or mistake." (*County of Imperial v. Superior Court* (2007) 152 Cal.App.4th 13, 34 [61 Cal.Rptr.3d 145].) This doctrine rests on the principle that litigation is not a war game unmoored from conceptions of ethics, truth, and justice. It is quite the reverse. Our adversarial system limits the affirmative duties owed by an advocate to his adversary, but that does not mean it frees him to deceive courts, argue out of both sides of his mouth, fabricate facts and rules of law, or seek affirmatively to obscure the relevant issues and considerations behind a smokescreen of self-contradictions and opportunistic flip-flops.

Indeed, even in their original brief on appeal respondents described appellant's various pleadings below as "alleg[ing] the same causes of action set forth in Patricia's constructive trust action . . . ." When we asked for comment on whether respondents should be estopped to deny that Patricia's complaint asserted a claim for distribution on appellant's behalf, respondents chose to read our question narrowly as referring only to the precise legal basis for Judge Yonts's order, which was, they now insist, not that the "same cause of action" was being asserted but rather that the Santa Clara court had "exclusive jurisdiction of the subject matter." To support this assertion they have requested judicial notice of additional pleadings. We have denied that request. It is far too late to draw the fine distinctions respondents seek to

make or to put forward the evidence that might support them. Having repeated to numerous judges that Patricia's action asserted the "same cause of action" as appellant's, respondents will not now be permitted to suggest otherwise—even if they had otherwise substantiated the suggestion, which they have not.

The present action is not barred by the statute of limitations.

## IV. *Compulsory Cross-complaint*

Respondents also assert that appellant's complaint was barred because it was a compulsory cross-complaint which, under Code of Civil Procedure section 426.30 (section 426.30), had to be filed in response to Patricia's civil complaint. This contention was not asserted as a ground of respondents' motion to strike but first appeared in their reply to appellant's opposition to that motion. As a result, appellant had no opportunity to meet it in the court below. In any case, we find it meritless.

Section 426.30 provides, "(a) Except as otherwise provided by statute, if a party *against whom* a complaint has been filed and served fails to allege in a cross-complaint any related cause of action which (at the time of serving his answer to the complaint) he has *against the plaintiff,* such party may not thereafter in any other action assert *against the plaintiff* the related cause of action not pleaded. [¶] (b) This section does not apply if either of the following are established: [¶] (1) The court in which the action is pending does not have jurisdiction to render a personal judgment against the person who failed to plead the related cause of action. [¶] (2) The person who failed to plead the related cause of action did not file an answer to the complaint against him." (Italics added.)

Respondents do not allude to the actual provisions of this statute, let alone demonstrate how they might be found to apply to this action. That they do *not* apply is obvious from the face of the statute which, by its plain terms, would only preclude appellant from filing a cause of action *against Patricia* that existed at the time of appellant's answer to Patricia's complaint. The claims at issue on this appeal are not asserted against Patricia, but against respondents. The compulsory cross-complaint rule has no bearing on these claims. Moreover the rule only applies to one "against whom" the earlier complaint was filed. As we have pointed out, Patricia's complaint was not filed "against" appellant. This makes it unnecessary to consider whether respondents' argument might founder on other grounds.

## DISPOSITION

The judgment of dismissal is reversed and remanded for proceedings consistent with this and the companion opinions.

Elia, J., and McAdams, J., concurred.

A petition for a rehearing was denied April 24, 2008, and the opinion was modified to read as printed above.